393 A.2d 1175

ADLER, BARISH, DANIELS, LEVIN AND CRESKOFF,
a partnership, Appellant,

v.

Alan B. EPSTEIN, Richard A. Weisbord, Arnold J. Wolf
and Sanford I. Jablon.

Supreme Court of Pennsylvania.

Argued April 20, 1978.

Decided Oct. 5, 1978.

Reargument Denied Nov. 6, 1978.

418

Drinker, Biddle & Reath, Patrick T. Ryan, Mark M. Wilcox, Ward T. Williams, Philadelphia, for appellant.

Alan M. Lerner, Philadelphia, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant, the law firm of Adler, Barish, Daniels, Levin and Creskoff, filed a Complaint in Equity in the Court of Common Pleas of Philadelphia. It sought to enjoin appellees,[1] former associates of Adler Barish, from interfering with existing contractual relationships between Adler Barish and its clients. The court of common pleas entered a final decree granting the requested relief, but a divided Superior Court dissolved the injunction and dismissed Adler Barish's complaint. We granted allowance of appeal. We now reverse and direct reinstatement of the decree of the court of common pleas.[2]

1. Appellees include Alan Epstein, Richard Weisbord, Arnold Wolf, and Sanford Jablon.

2. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1978).

## I. Background

From the formation of Adler Barish in February, 1976, through March of the next year, appellees were salaried associates of Adler Barish.[3] Appellees were under the supervision of Adler Barish partners, who directed appellees' work on cases which clients brought to the firm.[4]

While still working for Adler Barish, appellees decided to form their own law firm and took several steps toward achieving their goal. They retained counsel to advise them concerning their business venture, sought and found office space, and early in March, 1977, signed a lease.

Shortly before leaving Adler Barish, appellees procured a line of $150,000 from First Pennsylvania Bank. As security, appellees furnished bank officials with a list of eighty-eight cases and their anticipated legal fees, several of which were higher than $25,000, and together exceeded $500,000. No case on the list, however, was appellees'. Rather, each case was an Adler Barish case on which appellees were working.

**3.** In establishing Adler Barish, its partners brought with them approximately 1300 cases from their old law firm, Freedman, Borowsky and Lorry, in which they shared approximately half the profits, losses, and assets. The two firms later signed a writing whose terms gave Adler Barish custody and control over the 1300 files transferred, and preserved the financial interest partners of Adler Barish had before leaving the Freedman firm. Clients whose files were transferred became clients of Adler Barish. From March, 1976 to April, 1977, Adler Barish opened over six hundred new case files.

Appellees were salaried employees of the Freedman firm at the time Adler Barish was formed. Appellees left Freedman and went to work for Adler Barish.

We take our statement of facts from the findings of fact of the court of common pleas, sitting in equity. Neither party has challenged these findings, and the Superior Court did not disturb them. We accord the findings the weight of a jury verdict. *Garges Estate*, 474 Pa. 237, 378 A.2d 307 (1977); *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975).

**4.** Avram Adler, partner of Adler Barish, testified that each new client gave Adler Barish a power of attorney and signed a contingent fee agreement comporting with Rule 202 of the Philadelphia Rules of Civil Procedure. Appellees do not dispute this testimony; indeed, the court of common pleas concluded that these agreements were "valid and existing."

Appellee Alan Epstein's employment relationship with Adler Barish terminated on March 10, 1977.[5] At his request, Epstein continued to use offices of Adler Barish until March 19. During this time, and through April 4, when Adler Barish filed its complaint, Epstein was engaged in an active campaign to procure business for his new law firm. He initiated contacts, by phone and in person, with clients of Adler Barish with open cases on which he had worked while a salaried employee. Epstein advised the Adler Barish clients that he was leaving the firm and that they could choose to be represented by him, Adler Barish, or any other firm or attorney.

Epstein's attempt to procure business on behalf of the firm did not stop with these contacts. He mailed to the clients form letters which could be used to discharge Adler Barish as counsel, name Epstein the client's new counsel and create a contingent fee agreement.[6] Epstein also provided clients with a stamped envelope addressed to Epstein. Appellees Richard Weisbord, Arnold Wolf, and Sanford Jablon, who left Adler Barish on April 1, 1977, were aware of Epstein's efforts to procure this business on behalf of their new firm and did not attempt to curtail them. Indeed, Weisbord and Wolf, upon leaving Adler Barish, also immediately began to seek business, as did Epstein, for the new firm. They too informed clients of Adler Barish of their plans and that the clients were free to discharge Adler Barish and retain Weisbord and Wolf in its stead. Their efforts continued until Adler Barish filed its complaint.

Thus, clients of Adler Barish served a dual purpose in appellees' effort to start their own law firm. First, while

5. The firm received documents relating to cases for which it apparently had no file. Contrary to the firm's procedure, Epstein personally maintained files for some cases. Likewise, Epstein did not adhere to Adler Barish policy concerning certain fees. Adler Barish obtained a case which was assigned to Epstein. He sent the file to an out-of-state attorney for further handling. Instead of turning over the forwarding fee to the firm, Epstein kept it for himself. It appears that these events led to termination of Epstein's employment.

6. See Appendix.

appellees still worked for Adler Barish, Adler Barish cases formed the basis for appellees' obtaining bank credit. Then, appellees, as they left Adler Barish, made a concentrated attempt to procure the cases which had been used to obtain credit.

On April 4, the court of common pleas granted Adler Barish preliminary relief, enjoining appellees' campaign to obtain the business of Adler Barish clients.[7] One month later, on May 5, the court entered its final decree, which provided:

"[T]he defendants, ALAN B. EPSTEIN, RICHARD A. WEISBORD, ARNOLD J. WOLF and SANFORD I. JAB-LON, and all persons acting in concert with them or otherwise participating with them or acting in their aid or behalf, are permanently enjoined and restrained from contacting and/or communicating with those persons who up to and including April 1, 1977, had active legal matters pending with and were represented by the law firm of ADLER, BARISH, DANIELS, LEVIN and CRESKOFF, except that:

1. Nothing in this Final Decree shall be construed to preclude the defendants from announcing the formation of their new professional relationship in accordance with the requirements of DR 2–102 of the Code of Professional Responsibility.

2. Nothing in this Final Decree shall preclude those persons who, up to and including April 1, 1977, had active legal matters pending with and had been represented by the law firm of ADLER, BARISH, DANIELS, LEVIN and CRESKOFF from voluntarily discharging their present attorney and selecting any of the defendants, or any other attorney, to represent them."

7. The same day, the court granted a rule on appellees to show cause why a preliminary injunction should not issue. On April 11, the court began to hear testimony. The court had fixed April 7 as the date for a hearing on the rule but, because of a conflict in the schedule of appellees' counsel, rescheduled the hearing for April 11. At the request of appellees, the court treated the proceedings as a final hearing.

The court concluded that appellees "engaged in illegal solicitation in complete and total disregard for the Code of Professional Responsibility" and thereby "tortiously interfered with the contractual and business relations that exist between Adler Barish and its clients." It found equitable relief appropriate in view of appellees' "avowed intentions . . . to continue their illegal solicitation."

Appellees appealed to the Superior Court,[8] which reversed. In addition to granting Adler Barish's petition for allowance of appeal, we granted a stay and expedited argument.

## II. Appellees' Constitutional Claim

The facts found by the court of common pleas, which appellees do not dispute and the Superior Court did not disturb, demonstrate that, while leaving Adler Barish, appellees made numerous contacts with Adler Barish clients on whose active cases appellees were working before leaving Adler Barish. Adler Barish argues that appellees' conduct constitutes an intentional interference with existing contractual relationships between Adler Barish and its clients. According to Adler Barish, appellees' conduct is "deserving of censure, not encouragement." Appellees' on the other hand, contend that their conduct was "privileged," and that therefore no right of action for intentional interference lies. Moreover, they argue that their conduct is protected under the first and fourteenth amendments to the Constitution of the United States.

 "[S]peech which does 'no more than propose a commercial transaction'" is no longer outside the protection of the first and fourteenth amendments to the Constitution of the United States. *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48

8. On May 18, 1977, the Superior Court denied appellees' petition to stay the proceedings, "provided that an appeal bond in the sum of $200,000 is posted by [Adler Barish] by May 20, 1977," and advanced argument to June, 1977. The $200,000 appeal bond was twice the bond the court of common pleas fixed.

L.Ed.2d 346 (1976) (striking down state statute deeming licensed pharmacists' advertising of prescription drugs "unprofessional conduct"); see *Pennsylvania State Board of Pharmacy v. Pastor*, 441 Pa. 186, 272 A.2d 487 (1971) (invalidating Pennsylvania statute prohibiting advertising of "dangerous drugs" dispensible only with a physician's prescription). Accordingly, states are barred from imposing blanket prohibitions against truthful advertising of "routine" legal services. *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Such a blanket prohibition "serves to inhibit the free flow of commercial information and to keep the public in ignorance." Id., 433 U.S. at 365, 97 S.Ct. at 2700.

Nothing in the challenged decree prohibited appellees from engaging in the truthful advertising protected under *Bates*. Appellees could inform the general public, including clients of Adler Barish, of the availability of their legal services, and thus the "free flow of commercial information" to the public is unimpaired. Moreover, the injunction expressly permitted appellees to announce "formation of their new professional relationship in accordance with the requirements of DR 2–102 of the Code of Professional Responsibility." Appellees therefore were permitted to mail announcements to "lawyers, clients, former clients, personal friends, and relatives." Code of Professional Responsibility, DR 2–102(A)(2). This would include the very clients of Adler Barish whose business appellees sought. See Committee on Professional Ethics of the American Bar Association, Informal Decision No. 681 (August 1, 1963) (permitting departing attorney to send announcements "to those clients of the old firm for whom he had worked").

What the injunction did proscribe was appellees' "contacting and/or communicating with those persons who up to and including April 1, 1977, had active legal matters pending with and were represented by the law firm of ADLER, BARISH, DANIELS, LEVIN and CRESKOFF." Our task

is to decide whether the conduct of appellees is constitutionally subject to sanction.[9]

The Code of Professional Responsibility, DR 2–103(A) (as adopted, 1974), provides:

"A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer."

See also Code of Professional Responsibility, DR 2–104(A). Appellees clearly violated this "proscription against self-recommendation." *Berlant Appeal,* 458 Pa. 439, 443, 328 A.2d 471, 474 (1974), cert. denied, 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). They recommended their own employment, even though clients of Adler Barish did not seek appellees' advice "regarding employment of a lawyer."

*Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), makes plain that, after *Bates,* states may constitutionally impose sanctions upon attorneys engaging in conduct which violates these disciplinary rules, even though the conduct involves "commercial speech." In *Ohralik,* the state bar association suspended an attorney who "solicited" persons injured in an automobile accident by making visits to the hospital room where the persons were recovering. Mr. Justice Powell, speaking for the Court, emphasized that commercial speech does not enjoy the same constitutional protections traditionally afforded other forms of speech:

"In rejecting the notion that such speech 'is wholly outside the protection of the First Amendment,' *Virginia Pharmacy,* 425 U.S., at 761, 96 S.Ct. at 1825, we were careful not to hold 'that it is wholly undifferentiable from other forms' of speech. Id., at 771 n.24, 96 S.Ct. at 1830. We have not discarded the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government

**9.** Appellees have not disputed the constitutionality of an injunction as a form of sanction; rather, they argue that no sanction may, constitutionally, be imposed.

regulation, and other varieties of speech. Ibid. To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

. . : . .

"Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 883 (CA2 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), corporate proxy statements, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the exchange of price and production information among competitors, *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). See *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61–62, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973). Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. Neither *Virginia Pharmacy* nor *Bates* purported to cast doubt on the permissibility of these kinds of commercial regulation."

Id., 436 U.S. at 455–456, 98 S.Ct. at 1918–19 (footnote omitted). In rejecting the attorney's constitutional claim, the Court determined that the state's interests were important enough to support regulation of the attorney's conduct:

"As applied in this case, the disciplinary rules are said to have limited the communication of two kinds of information. First, appellant's solicitation imparted to Carol McClintock and Wanda Lou Holbert certain information about his availability and the terms of his proposed legal services. In this respect, in-person solicitation serves much the same function as the advertisement at issue in *Bates*. But there are significant differences as well. Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that 'the fitting remedy for evil counsels is good ones' is of little value when the circumstances provide no opportunity for any remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices' of legal services, cf. *Bates*, supra, 433 U.S. at 364, 97 S.Ct. at 2699, it actually may disserve the individual and societal interest, identified in *Bates*, in facilitating 'informed and reliable decisionmaking.' Ibid."

Id., 436 U.S. at 457, 98 S.Ct. at 1919 (footnotes omitted).

Just as in *Ohralik*, appellees' conduct frustrates, rather than advances, Adler Barish clients' "informed and reliable decisionmaking." After making Adler Barish clients expressly aware that appellees' new firm was interested in procuring their active cases, Epstein provided the clients the forms that would sever one attorney-client relationship and create another. Epstein's aim was to encourage speedy, simple action by the client. All the client needed to do was to "sign on the dotted line" and mail the forms in the

self-addressed, stamped envelopes. Other appellees condoned Epstein's conduct on behalf of appellees' new firm. Indeed, upon their departure, appellees Weisbord and Wolf informed Adler Barish clients that they could discharge Adler Barish and retain appellees.[10]

Thus, appellees were actively attempting to induce the clients to change law firms in the middle of their active cases. Appellees' concern for their line of credit and the success of their new law firm gave them an immediate, personally created financial interest in the clients' decisions. In this atmosphere, appellees' contacts posed too great a risk that clients would not have the opportunity to make a careful, informed decision. Compare Code of Professional Responsibility, EC 2–10 (directing that standards for attorney advertising "facilitate informed selection of lawyers by potential consumers of legal services"). "[T]o reduce the likelihood of overreaching and the exertion of undue influence on lay persons; to protect the privacy of individuals; and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest," *Ohralik v. Ohio State Bar Association,* 436 U.S. at 461, 98 S.Ct. at 1921, we must reject appellees' argument and conclude that, just as in *Ohralik,* the Constitution permits regulation of their conduct.[11]

**10.** Appellees' contacts pose consequences more serious than mailing of announcements in conformity with DR 2–102 and as allowed by the decree of the court of common pleas. Appellees' contacts make express their interest in Adler Barish clients' cases, while announcements, at most, only suggest the same. Moreover, appellees' form letters and self-addressed envelopes, unlike announcements, provide appellees a means of benefitting from a clients' immediate, perhaps ill-considered, response to the circumstances.

**11.** We also recognize that *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), forbids governmental sanctioning of an attorney who, in pursuit of ideological goals, advises a prospective client of legal rights and offers the free legal assistance of a nonprofit organization of which the attorney is a member. But appellees' goals were vastly different. Appellees were interested not in any particular client or the specific issues the cases they sought might raise, but rather their own financial gain.

## III. The Right of Action

Thus, we turn to whether the court of common pleas properly concluded that Adler Barish is entitled to relief. In *Birl v. Philadelphia Electric Co.*, 402 Pa. 297, 167 A.2d 472 (1961), this Court adopted Section 766 of Restatement of Torts and its definition of the right of action for intentional interference with existing contractual relations.[12] There, we stated:

"At least since *Lumley v. Gye* (1853), 2 Ell. & Bl. 216, 1 Eng.Rul.Cas. 706, the common law has recognized an action in tort for an intentional, unprivileged interference with contractual relations. It is generally recognized that one has the right to pursue his business relations or employment free from interference on the part of other persons except where such interference is justified or constitutes an exercise of an absolute right: Restatement, Torts, § 766. The Special Note to comment m. in § 766 points out: 'There are frequent expressions in judicial

12. Two earlier cases cited Restatement of Torts, § 766, with approval. *Bloom v. Devonian Gas & Oil Co.*, 397 Pa. 309, 155 A.2d 195 (1959); *Bright v. Pittsburgh Musical Society*, 379 Pa. 335, 108 A.2d 810 (1954).

This Court had long recognized a right of action for interference with existing contractual relations. For example, in *Vanarsdale v. Laverty*, 69 Pa. 103 (1871), we affirmed a judgment against citizens of a community who, without justification, petitioned their school board to terminate the employment of the plaintiff, a school teacher. "A groundless petition instigated only by malice cannot surely be the right of any citizen where it actually results in harm to the object of its malicious purpose." 69 Pa. at 109. In *Caskie v. Philadelphia Rapid Transit Co.*, 321 Pa. 157, 184 A. 17 (1936), we found sufficient to state a cause of action plaintiff's allegations that the defendant misrepresented to the party with whom plaintiff had contracted that the party did not have to pay plaintiff for services performed. And, in *Dora v. Dora*, 392 Pa. 433, 141 A.2d 587 (1958), we upheld plaintiffs' right of action where the defendant bank, upon the misrepresentations of other defendants, improperly paid over funds to which plaintiffs, pursuant to a settlement agreement, were entitled. " '[I]t is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference;' . . . intentional doing of the wrongful act without legal justification [is] all that [is] necessary [to state a cause of action]." 392 Pa. at 433, 141 A.2d at 590 (quoting *Klauder v. Cregar*, 327 Pa. 1, 7, 192 A. 667, 670 (1937)).

opinions that "malice" is requisite for liability in the cases treated in this Section. But the context and course of decision make it clear that what is meant is not malice in the sense of ill will but merely purposeful interference without justification.' Our cases are in accord: *Klauder v. Cregar*, [supra;] *Dora v. Dora*, [supra.]

"The elements of this tort of inducing breach of contract or refusal to deal, which must be averred in the complaint, are set forth in the Restatement, Torts, § 766, which says, '. . . one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby'. In other words, the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result."

402 Pa. at 300–301, 167 A.2d at 474 (footnotes omitted).[13]

■ In its continuing effort to provide the judicial system orderly and accurate restatements of the common law, the

---

**13.** Accordingly, in *Birl* we compared plaintiff's allegations that the defendants induced plaintiff's employer to terminate plaintiff's employment with the elements set forth in Section 766 and concluded that the plaintiff "sufficiently aver[red] an intentional or purposeful, and unprivileged, interference with [his] contractual or business relationship, aimed at a severance of [plaintiff's employment], to constitute an actionable wrong." 402 Pa. at 303, 167 A.2d at 475.

Since *Birl*, we have repeatedly looked to the Restatement as authority for the elements of a cause of action for intentional interference with existing contract relations. E. g., *Capecci v. Liberty Corp.*, 406 Pa. 197, 176 A.2d 664 (1962) (applying Restatement, but denying plaintiff relief for want of proper proof of unlawful inducement); *Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964) ("where, as in this case, the allegations and evidence only disclose that defendant breached his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action"). Also, in *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), we made clear our adoption of that portion of Section 766 relating to interference with prospective, as opposed to existing, contract relations. Thus, in

American Law Institute has reviewed each section of the Restatement of Torts, including Section 766. Section 766 of the Restatement (Second) of Torts (Tent. Draft No. 23, 1977), states the Institute's present view of what constitutes the elements of the cause of action before us:

> "*Intentional Interference with Performance of Contract by Third Person*
>
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract."

This Court constantly seeks to harmonize common law rules, principles, and doctrines with modern perceptions of societal needs and responsibilities. See e. g., *Glenn v. Point Park College,* 441 Pa. 474, 481, 272 A.2d 895, 899 (1971) (relying upon Tentative Draft of § 766A, Restatement (Second) of Torts (Tent. Draft No. 14, 1969), in upholding right of action for interference with prospective contract relations).[14] Accordingly, we believe it appropriate to analyze this case in light of the approach fashioned by Restatement (Second). Accord, *Augustine v. Anti-Defamation League,* 75 Wis.2d 207, 249 N.W.2d 547 (1977).

An examination of this case in light of Restatement (Second) of Torts, § 766, reveals that the sole dispute is whether appellees' conduct is "improper." There is no doubt

*Glenn* we upheld real estate brokers' right of action where they sought damages from the vendee of realty for the vendee's direct purchase of realty from the vendor, depriving brokers "prospective economic gain" in the form of anticipated commissions on the sale.

14. Cf. *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 793 (3rd Cir. 1978) (federal court of appeals, reviewing conclusions of law of federal district court sitting in diversity case, observing that: "the Supreme Court of Pennsylvania's customary practice, when fashioning new principles of law, of according great weight to the decisions of other jurisdictions and the trend of recent cases would lead it to follow . . . numerous courts . . . in situations analogous to the present case") (footnote, citing Pennsylvania cases, omitted).

that appellees intentionally sought to interfere with performance of the contractual relations between Adler Barish and its clients. While still at Adler Barish, appellees' behavior, particularly their use of expected fees from Adler Barish clients' cases, indicates appellees' desire to gain a segment of the firm's business. This pattern of conduct continued until the court of common pleas enjoined it. Indeed, appellees' intentional efforts to obtain a share of Adler Barish's business were successful. The record reveals that several clients signed the forms Epstein prepared on behalf of appellees notifying Adler Barish that the clients no longer wished the services of Adler Barish.[15] Likewise, the record reveals that Adler Barish and its clients were parties to valid, existing contracts.[16]

In assessing whether appellees' conduct is "improper," we bear in mind what this Court stated in *Glenn v. Point Park College,* supra, 441 Pa. at 482, 272 A.2d at 899, where we analyzed "privileges" in conjunction with the closely related right of action for intentional interference with prospective contract relations:

"The absence of privilege or justification in the tort under discussion is closely related to the element of intent. As stated by Harper & James, The Law of Torts, § 6.11, at 513–14: '. . . where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability.' What is or is not privileged conduct in a given situation is not susceptible of

15. Plaintiff's Exhibits P–20—P–29 are the forms Epstein prepared discharging Adler Barish as counsel which various Adler Barish clients signed.

16. See supra note 4; *Richette v. Pennsylvania Railroad,* 410 Pa. 6, 21, 187 A.2d 910, 918 (1963) ("'the law has long been settled that contracts for [contingent] fees are lawful and enforceable by the courts'").

precise definition. Harper & Hames refer in general to interferences which 'are sanctioned by the "rules of the game" which society has adopted', and to 'the area of socially acceptable conduct which the law regards as privileged,' id. at 510, 511, and treat the subject in detail in §§ 6.12 and 6.13."

We are guided, too, by Section 767 of Restatement (Second) of Torts, which focuses on what factors should be considered in determining whether conduct is "improper:"

"In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) The nature of the actor's conduct,

(b) The actor's motive,

(c) The interests of the other with which the actor's conduct interferes,

(d) The interests sought to be advanced by the actor,

(e) The proximity or remoteness of the actor's conduct to the interference and

(f) The relations between the parties." [17]

17. Thus, new Restatement (Second) of Torts focuses upon whether conduct is "proper," rather than "privileged." Compare Restatement of Torts, § 766 (1939) ("[e]xcept as stated in Section 698 [(relating to contracts to marry)], *one who without a privilege to do so,* induces or otherwise purposely causes a third person not to ¶ (a) perform a contract with another, or ¶ (b) enter into or continue a business relation with another ¶ is liable to the other for the harm caused thereby" (emphasis added)). Comment b to Restatement (Second) of Torts, supra at § 767, explains the shift in inquiry:

"*Privilege to interfere, or interference not improper.* Unlike other intentional torts such as intentional injury to person or property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act in the manner stated in §§ 766, 766A or 766B. Because of this fact, this Section is expressed in terms of whether the interference is improper or not rather than in terms of a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another."

We find nothing in the "'rules of the game' which society has adopted"[18] which sanctions appellees' conduct. Indeed, the rules which apply to those who enjoy the privilege of practicing law in this Commonwealth expressly disapprove appellees' method of obtaining clients. Supra Part IIA, discussing Code of Professional Responsibility, DR 2–103(A). We find such a departure from "[r]ecognized ethical codes" "significant in evaluating the nature of [appellees'] conduct." Restatement (Second) of Torts, supra at § 767 comment c.[19] All the reasons underlying our Disciplinary Rules' "proscription against [appellees'] self-recommendation," *Berlant Appeal,* supra, 458 Pa. at 443, 328 A.2d at 474, especially the concern that appellees' contacts too easily could overreach and unduly influence Adler Barish clients with active cases, are relevant here.

Appellees' conduct adversely affected more than the informed and reliable decisionmaking of Adler Barish clients with active cases. Their conduct also had an immediate impact upon Adler Barish. Adler Barish was prepared to continue to perform services for its clients and therefore could anticipate receiving compensation for the value of its efforts. Moreover, as we concluded in *Richette. v. Pennsylvania Railroad,* 410 Pa. 6, 187 A.2d 910 (1963), Adler Barish's fee agreements with clients were a source of anticipated revenue protected from outside interference.[20]

**18.** *Glenn v. Point Park College,* supra, 441 Pa. at 482, 272 A.2d at 899, quoting Harper & James, The Law of Torts, § 6.11.

**19.** Restatement (Second) of Torts, supra at § 767 comment c, provides in full:

"*Business ethics and customs.* Recognized ethical codes for a particular area of business activity and established customs or practices regarding approved or disapproved actions or methods may also be significant in evaluating the nature of the actor's conduct as a factor in determining whether his interference with the plaintiff's economic relations was improper or not."

**20.** In *Richette,* an attorney representing an employee of the defendant railroad company and member of the defendant union, brought suit charging that defendants improperly interfered with a fee agreement between plaintiff and the employee. The employee, injured at work, had retained plaintiff, but later discharged him. In upholding

It is true that, upon termination of their employment relationship with Adler Barish, appellees were free to engage in their own business venture. See Restatement (Second) of Agency, § 396(a) (1958) ("[u]nless otherwise agreed, after termination of the agency, the agent . . . has no duty not to compete with the principal"); *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A.2d 469 (1964) (trial court improperly enjoined competition with former employer, in the absence of either non-competition covenant or protectible "customer route"). But appellees' right to pursue their own business interests is not absolute. "[U]nless otherwise agreed, after the termination of the agency, the agent . . . has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation"). Restatement (Second) of Agency, supra at § 396(d).

▮ Appellees' contacts were possible because Adler Barish partners trusted appellees with the high responsibility of developing its clients' cases. From this position of trust and

the jury's award of compensatory damages for plaintiff, this Court concluded:

"The jury was warranted in finding from the evidence presented that the named defendants coordinated, through wile, stratagem and deception to separate an attorney from his client. It could not be said, as a matter of the law, that the jury went astray when they concluded, as they must have, that [the employee] did not voluntarily write a letter revoking his power of attorney to [plaintiff]. Logic, sequence of events, and palpable circumstances justify their conclusion that the railroad company representatives prepared a letter of revocation, that they employed a maneuver to have [the employee] copy that letter outside the railroad company office, thinking that this would wipe away their participation in the affair; that they supplied [the employee] with the paper on which he was to copy the letter of revocation; that [a union official], working with the railroad, supervised the copying, and supplied the envelope, in which he placed the letter, which he consigned to the United States mails. The jury were warranted in concluding that all the named defendants were a part of this plan and participated fully in the enterprise which finally resulted in depriving a member of the Philadelphia bar from legal business properly his."

410 Pa. at 13–14, 187 A.2d at 914–15. First Pennsylvania Bank's willingness to extend appellees credit on the basis of expected fees from cases confirms the financial significance of Adler Barish's fee agreements.

responsibility, appellees were able to gain knowledge of the details, and status, of each case to which appellees had been assigned. In the atmosphere surrounding appellees' departure, appellees' contacts unduly suggested a course of action for Adler Barish clients and unfairly prejudiced Adler Barish. No public interest is served in condoning use of confidential information which has these effects. Clients too easily may suffer in the end.[21]

## IV. Conclusion

In *Ohralik,* Mr. Justice Powell emphasized:

"[T]he state bears a special responsibility for maintaining standards among members of the licensed professions. See *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Semler v. Oregon State Bd. of Dental Examiners,* 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935). 'The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." '

21. Moreover, appellees neither occupied the same status, nor pursued the same goals, as the defendants in *Watch Tower Bible & Tract Society v. Dougherty,* 337 Pa. 286, 11 A.2d 147 (1940). There, we concluded that defendants, leaders of their church, "cannot be mulcted in damages for protesting against the utterances of one who they believe attacks their church and misrepresents its teachings or for inducing their adherents to make similar protests." 337 Pa. at 288, 11 A.2d at 148. Nor were appellees engaging in conduct like the defendant in *R. S. Noonan, Inc. v. York School District,* 400 Pa. 391, 162 A.2d 623 (1960) (alternative holding), where we found "privileged" the actions of a school board architect who, upon the direction of the school board, advertised for new bids after the board rejected plaintiff's previous low bid.

Appellees suggest that injunctive relief was inappropriate. "It is well settled that equity will act to prevent unjustified interference with contractual relations." *Neel v. Allegheny County Memorial Park,* 391 Pa. 354, 357, 137 A.2d 785, 787 (1958). Accord, Restatement (Second) of Torts, supra at § 766 comment t (approving injunctive relief "in appropriate circumstances"). Given appellees' interest in maintaining the line of credit established on the basis of Adler Barish cases, and appellees' express intent to continue their effort to gain Adler Barish clients, we believe the court of common pleas could properly conclude that equitable relief was necessary to protect all the interests at stake in this case.

*Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975). While lawyers act in part as 'self-employed businessmen,' they also act 'as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes.' *Cohen v. Hurley,* 366 U.S. 117, 124, 81 S.Ct. 954, 958, 6 L.Ed.2d 156 (1961)."

*Ohralik v. Ohio State Bar Association,* 436 U.S. at 460, 98 S.Ct. at 1920–21. Our "special responsibility" includes the obligation to assure that persons seeking professional legal assistance receive the quality advocacy and fair treatment they justifiably expect. Our responsibility also includes the duty to provide an atmosphere conducive to proper attorney-client relationships, including those situations where, as here, associates assist other members of a firm in rendering legal services. Consistent with these jurisprudential concerns, our supervisory authority over practitioners in our courts, prior decisions, the Code of Professional Responsibility, and Restatement (Second) of Torts, it must be concluded that the court of common pleas correctly determined that Adler Barish is entitled to relief.

Order of the Superior Court reversed and court of common pleas directed to reinstate its final decree. Each party pay own costs.

MANDERINO, J., filed a dissenting opinion.

## APPENDIX

Epstein sent the following cover letter:

404 South Camac Street
Philadelphia, Pennsylvania 19147
March 25, 1977

Re:

Dear

In confirmation of our recent conversation, I have terminated my association with the offices of Adler, Barish,

Daniels, Levin and Creskoff and will be continuing in the practice of law in center city Philadelphia. As I explained, you have the right to determine who shall represent your interests and handle the above-captioned matter in the future. You may elect to be represented by my former office, me or any other attorney permitted to practice in this jurisdiction.

During our conversation, you expressed a desire to have me continue as your legal representative, and in recognition of your choice in this regard, I have enclosed two documents which must be signed and returned to me in the enclosed stamped, addressed envelope to effect this end. Copies of these documents are also enclosed for your records.

If you have any questions regarding these materials or any other matter, feel free to call me at KI 6–5223.

Sincerely,

Alan B. Epstein

ABE/ete
Enclosure

The Form discharging Adler Barish provides:

Messrs. Adler, Barish, Daniels,
 Levin & Creskoff

2nd Floor, Rohm & Haas Building
Sixth & Market Streets
Philadelphia, PA 19106

Re:

Gentlemen:

I have been advised that Alan B. Epstein, Esquire has terminated his association with your firm of attorneys and it has been carefully explained to me that I have the right to determine who shall represent me and handle the above-captioned matter.

This correspondence is to serve notice I hereby discharge the office of Adler, Barish, Daniels, Levin & Creskoff from

any further representation of me whatsoever and request that the members of your firm and/or your employees or agents refrain from acting against my wishes in this regard or my interests in any way whatsoever.

This letter is to also serve as my notice and request that I want Alan B. Epstein to be my attorney in this matter, to keep or secure my file and all allied papers, and to handle this matter and represent me.

I further direct you to deliver immediately to my attorney, Alan B. Epstein, my entire file and all allied papers and to refrain further from any actions contrary to my attorney's wishes or directions in connection with this matter.

Very truly yours,

The following fee agreement was also sent to Adler Barish clients:

CONTINGENT FEE AGREEMENT

_____
Date

I (we) hereby constitute and appoint ALAN EPSTEIN as my (our) attorney to prosecute a claim for me (us) for _____
against all responsible parties, including, but not limited to _____.
The claimant (deceased) is _____, and the cause of action arose on _____.

I (we) hereby agree that the compensation of my (our) attorney for services shall be determined as follows:

_____
_____
_____

I (we) hereby acknowledge receipt of a duplicate copy of this Contingent Fee Agreement.

_____ _____
Name Name

_____ _____
Address Address

MANDERINO, Justice, dissenting.

I dissent. The opinions of Judge Hoffman and Judge Spaeth in the Superior Court leave no doubt that injunctive relief in this case is completely unwarranted. *Adler, Barish, et al. v. Epstein, etc.* Superior Court, 382 A.2d 1286 (1977). Since their opinions were filed, *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) has been decided by the United States Supreme Court. That decision relied on by the majority does not support the majority's reinstatement of an injunction in violation of appellees' free speech rights. *Ohralik* condemned *in-person* solicitation which deprives citizens of an opportunity for reflection before signing quickly on the dotted line. *Id. at* 1917. It does not, as the majority asserts, condemn regulation of the type of speech or conduct engaged in by the appellees which *did not* include any coercive *in-person* solicitation. The majority's reliance on *Ohralik* is completely unwarranted.

Specifically, the majority relying on *Ohralik* concludes that appellees, former associates of the law firm, Adler, Barish, engaged in illegal solicitation when they mailed to the clients of Adler, Barish form letters which could be executed to discharge Adler, Barish as counsel, name appellees as client's new counsel and then create a contingent fee agreement.

Contrary to the majority's analysis, however, the United States Supreme Court's decision in *Ohralik* does not prohibit the type of direct solicitation which is before this Court today.

When the majority says that "just as in *Ohralik,* the [Federal] Constitution permits regulation of their [appellees'] conduct," it widely misses the mark. *See* at 1181.

One need not be a legal scholar to see the distinction for First Amendment purposes between the ambulance-chasing tactics used by the lawyer in *Ohralik* and the written communications which appellees mailed to the clients of Adler, Barish. The letters sent to prospective clients which would

discharge Adler, Barish should the client sign on the dotted line contained no arm-twisting device pressuring clients to make an immediate response. Nor were these clients uninformed about the choices they could make in either retaining or discharging Adler, Barish as legal counsel. Additionally, appellees' communication contained *no* false and misleading statements which would confuse, deceive, or mislead prospective clients. More importantly, appellees did not attempt to motivate these clients to stir up litigation as was done in *Ohralik*.

This Court today misuses its injunctive powers to prohibit not only what is a protected form of direct solicitation under the First Amendment but to prohibit an attorney from truthfully informing a client about the client's legal rights. The Order of the Superior Court should therefore be affirmed.