NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3564
_____

DOMMEL PROPERTIES LLC;
LAND OF BELIEVE FARM INC;
WILLIAM J. DOMMEL; ROBERT DOMMEL,
                    Appellants

v.

JONESTOWN BANK AND TRUST COMPANY,
n/k/a JBT; LEBANON COUNTY TAX CLAIM BUREAU;
SALLIE A. NEUIN
_____

On Appeal from United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 1-11-cv-02316)
District Judge:  Honorable Christopher C. Conner
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 28, 2015

Before:  FISHER, HARDIMAN and ROTH, *Circuit Judges*.

(Filed:  September 16, 2015)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1

FISHER, *Circuit Judge*.

William J. Dommel, Dommel Properties, LLC, and Land of Believe Farm, Inc. (collectively, the "Dommels"), sued the Jonestown Bank and Trust Company (the "Bank") for negligence, fraud, and intentional interference with contract, among other claims, involving alleged misrepresentations made to Mr. Dommel and a third party in connection with a tax sale of Mr. Dommel's horse-breeding farm. The United States District Court for the Middle District of Pennsylvania entered summary judgment in favor of the Bank. We affirm in part and vacate in part in light of the Supreme Court of Pennsylvania's intervening decision in *Bruno v. Erie Insurance Co.*[1]

I.

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts that are necessary to our analysis.

Mr. Dommel and his late father, Robert Dommel,[2] entered into three loan agreements with the Bank, borrowing in excess of $4,330,000. The loans were secured by mortgages on the Dommels' commercial horse-breeding farms (hereinafter, "Farm

---

[1] 106 A.3d 48 (Pa. 2014).

[2] Robert Dommel, deceased, was dismissed as a plaintiff pursuant to Federal Rule of Civil Procedure 25(a)(1). *See* J.A. at 3-4.

One" and "Farm Two"). The loan agreements authorized the Bank to, among other things, foreclose on the properties in case of default and confess or enter judgment.[3]

The Dommels were unable to make payments on their loans, and the Bank issued a notice of default on April 10, 2008. The parties agreed to auction Farm One, and they entered into a forbearance agreement on May 28, 2008, whereby the Dommels acknowledged their default and the Bank's ability to proceed with its rights and remedies contained in the loan agreements. After the auction of Farm One failed,[4] the Bank confessed judgment on the loans in the total amount of $5,173,659. The parties attempted to reach a debt workout agreement, but they were unable to do so, and the Bank bought Farm One at a sheriff's sale in execution of the judgment.

The parties continued negotiations and entered into a second forbearance agreement on August 10, 2009, whereby the Dommels again acknowledged their default and the Bank's right to pursue its remedies under the loan agreements. The Dommels remained in default, and the Bank proceeded to execute the judgment by listing Farm Two for a sheriff's sale scheduled for October 11, 2011. However, the Dommels had also failed to pay taxes on Farm Two, and, after they defaulted on an agreement with the Tax Claim Bureau, a tax sale was scheduled a month prior to the sheriff's sale.

---

[3] *See* J.A. at 407, 466-67, 477-78.
[4] Allegedly, the Dommels threatened to sue the Bank if the Bank accepted the low bid price it received. *See* J.A. at 12.

3

On September 9, 2011, three days prior to the tax sale, Mr. Dommel met with Roger Jeremiah, then-Head of Lending, and Richard Rollman, Vice President of Commercial Lending, and provided them a $5,000 check. According to the Dommels, the check constituted consideration for the Bank's agreement not to bid on Farm Two at the tax sale. According to the Bank, however, the $5,000 went toward repayment of the Dommels' outstanding loan obligations. Mr. Dommel was given a letter explaining that the Bank's acceptance of the check "in no way constitutes an agreement by the Bank to forbear" on its ability to pursue its rights and remedies under the loan agreements.[5] Mr. Dommel contends that he never received the reservation of rights letter; yet, a copy of the letter was emailed to the Dommels' attorney.[6] In alleged reliance on their expectation that the Bank would not bid on Farm Two, the Dommels did not take any action to ensure that Farm Two was not sold. At the tax sale held on September 12, 2011, the Bank ultimately purchased Farm Two as the sole bidder.

After the tax sale of Farm Two and before the Bank obtained the deed, the Bank sent a letter to Thomas McClay, one of the Dommels' largest clients, asserting that Farm Two now belonged to the Bank and demanding that all boarding agreements and

---

[5] J.A. at 791. The Notes for two of the loans also stipulated that "[n]o course of dealing between Borrowers and Bank or any holder of this Note, nor any delay on the part of Bank or any holder of this Note in exercising any rights under this Note or any of the other loan documents shall operate as a waiver of any rights of Bank or any other holder of this Note." J.A. at 466, 477.

[6] J.A. at 794-95.

payments were to be sent to the Bank as the current owner.[7]  The Dommels allege that

Mr. McClay subsequently decreased the number of horses he boarded at Farm Two.

The Dommels sued the Bank on December 14, 2011.  After certain claims not

relevant to this appeal were dismissed, both parties moved for summary judgment.  On

July 9, 2014, the District Court denied the Dommels' motion and granted the Bank's

motion as to the claims for, *inter alia*, negligent misrepresentation, fraud, and intentional

interference with contract.  It held that the Dommels' claims for negligent

misrepresentation and fraud[8] were barred by the "gist of the action" doctrine, since the

alleged misrepresentations were made in pursuit of the Bank's rights and remedies under

the contract, i.e., loan agreements.  As to intentional interference with contract, the

District Court concluded that it could "find[] no evidence that the letter from the Bank to

Mr. McClay resulted in a breach or non-performance of the boarding contract."[9]  The

Dommels timely appealed.

## II.

The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This Court exercises appellate

jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review over the District

---

[7] J.A. at 1256.

[8] For purposes of determining whether the gist of the action doctrine applies, the Court will assess the Dommels' negligent misrepresentation and fraud claims together, as both claims arise from the same course of conduct (i.e., the Bank's alleged misrepresentations).

[9] J.A. at 33.

Court's grant of a motion for summary judgment and, in doing so, "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."[10]

## III.

We discuss the Dommels' claims for (A) negligent misrepresentation and fraud and (B) intentional interference with contract in turn.

## A.

The gist of the action doctrine precludes tort claims where the true gravamen, or gist, of the claim sounds in contract.[11] Because the Pennsylvania Supreme Court had not yet adopted the doctrine, the District Court and the parties relied on the Pennsylvania Superior Court's decision in *eToll, Inc. v. Elias/Savion Advertising, Inc.*, which bars a tort claim where it, *inter alia*, "aris[es] solely from a contract between the parties," "concern[s] the performance of contractual duties," or is "inextricably intertwined" with the contract.[12] Accordingly, the District Court barred the Dommels' fraud claim because "[t]he Bank made the allegedly fraudulent misrepresentations in pursuit of its rights and

---

[10] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 274, 265 (3d Cir. 2014) (internal quotation marks omitted).

[11] *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).

[12] 811 A.2d 10, 19, 21 (Pa. Super. 2002); *cf. Bruno*, 106 A.3d at 67 n.14 (explaining that "[b]oth the Third Circuit Court of Appeals, as well as some federal district courts, have looked to *eToll* as the controlling statement of Pennsylvania law in this area").

remedies under the loan documents,"[13] and, therefore, it was "plainly linked to the contracts between the parties."[14] Similarly, it barred the negligent misrepresentation claim because it was "inextricably intertwined with the parties' contractual obligations" and because "the duty of care would not arise but for the contractual relationship between the Dommels and the Bank."[15]

In its intervening decision in *Bruno*, the Supreme Court of Pennsylvania expounded upon the gist of the action doctrine for the first time.[16]  It clarified that "[t]he general governing principle which can be derived from" its synthesis of state court decisions is that "the *nature of the duty* alleged to have been breached . . . [is] the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract."[17]  "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do

---

[13] J.A. at 42.

[14] J.A. at 43-44.

[15] J.A. at 45-46.

[16] While the Pennsylvania Supreme Court has applied the gist of the action doctrine previously, it noted in *Bruno* that it had not formally adopted the doctrine and did not necessarily do so in *Bruno* itself.  *See* 106 A.3d at 56, 60 & n.10.  Rather, it explained that "[a]s part of our determination of the issue we accepted for review, we must, necessarily, explicate the governing legal principles."  *Id.* at 60 n.10.

[17] *Id*. at 68 (emphasis added). This is not the first time the duty-based standard has been articulated.  *See id.* at 69 (noting that the "duty-based" demarcation was first recognized over a century and a half ago); *see, e.g.*, *Bash v. Bell Telephone Co.*, 601 A.2d 825, 829 (Pa. Super. 1992) ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.") (internal quotation marks omitted).  The District Court itself mentioned the standard as articulated in *Bash*, but it did not apply it.  *See* J.A. at 41.

something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract."[18] On the other hand, "[i]f . . . the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort."[19]  In summary, the court "reaffirm[ed]" the "duty-based" analytical framework "as the touchstone standard for ascertaining the true gist or gravamen of a claim."[20]

The court then applied the standard to the facts in *Bruno*.  There, David and Angela Bruno (the "Brunos") purchased an insurance policy requiring Erie Insurance Company ("Erie") to inspect for mold and pay up to $5,000 for the cost of removal. Erie's inspectors confirmed mold in the Brunos' home on two separate occasions, but they erroneously determined that the mold was non-toxic and need not be removed.  The Brunos subsequently became ill and sued Erie for negligence in conducting the investigation.

The *Bruno* court first explained that whether Erie found toxic or non-toxic mold was "quite simply . . . not based on Erie's violation of any of [its] contractual commitments," since the Brunos did not allege that Erie failed to inspect or pay up to

---

[18] *Bruno*, 106 A.3d at 68.
[19] *Id*.
[20] *Id.* at 69.

$5,000 for removal per its obligations under the policy.[21]  Rather, "the Brunos' claim against Erie is predicated on the allegedly negligent actions taken by its agents on behalf of Erie *while* they were performing Erie's contractual obligation to investigate the claim made by the Brunos under their policy."[22] "Consequently, [the Brunos'] allegations of negligence facially concern Erie's alleged breach of a general social duty, not a breach of any duty created by the insurance policy itself,"[23] and, therefore, the claim was not barred by the gist of the action doctrine.

While the *Bruno* court did not explicitly overrule *eToll* or its progeny, it explained that *eToll* creates a divide in the gist of the action jurisprudence,[24] did not rely on any of the *eToll* factors in reaffirming the duty-based standard from which *eToll* departs,[25] and cabined reliance on *eToll*'s "inextricably intertwined" language.[26]  There are also inconsistences that the *Bruno* decision did not explicitly mention.  In particular, *Bruno* provides that "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract

---

[21] *Id*. at 70.

[22] *Id.*

[23] *Id*. at 71.

[24] *See id.* at 56-57, 66-67.

[25] *See id.* at 69.

[26] *Id*. at 69 n.17 ("With respect to the Superior Court's *eToll* decision, we note that, because that court acknowledged in its opinion this source of duty distinction and incorporated it into its analysis, its consideration of whether tort and contract claims brought together in the same action are 'inextricably intertwined' should be viewed in this context, i.e., as a determination of whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claims.").

9

itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract,"[27] whereas *eToll* provides that "the gist of the action doctrine should apply to claims for fraud in the performance of a contract."[28]

Using *eToll* as guidance, the District Court did not engage in the duty-based analysis that *Bruno* advanced; rather, the basis for the District Court's decision was that the Bank's alleged misrepresentations occurred in pursuit of its rights and remedies under the loan agreements and were therefore "plainly linked to" or "inextricably intertwined with" its contractual obligations.[29] Because the District Court did not have the opportunity to conduct its analysis under *Bruno*, we will allow it to reconsider its analysis in the first instance.[30] Thus, we vacate and remand its order with respect to the negligent misrepresentation and fraud claims.

B.

As for the Dommels' intentional interference with contract claim, we agree with the District Court that summary judgment in favor of the Bank was proper. Section 766

---

[27] *Id*. at 70.

[28] 811 A.2d at 20.

[29] *See* J.A. at 42, 43, 45.

[30] *Cf. In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 186 (3d Cir. 2015) (vacating and remanding where the district court "did not have the opportunity to consider . . . later-issued guidance [by the U.S. Supreme Court] in the first instance").

of the Restatement (Second) of Torts, which the Supreme Court of Pennsylvania has adopted,[31] provides:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

As one lower federal court aptly summarized, "the bulk of the case law, as well as the plain language of . . . section 766, mandates that a plaintiff bringing an intentional interference claim must allege breach or nonperformance."[32]

In the case at bar, there is no evidence indicating that the letter from the Bank to Mr. McClay resulted in a breach or nonperformance of the boarding contract. Although the Bank's letter did make Mr. McClay fear that his horses would be caught up in legal proceedings,[33] at all times after receipt of the letter Mr. McClay boarded no less than ten horses at Farm Two and, at several points, he even increased the number of horses he boarded there. Indeed, as the record makes clear, Mr. McClay's monthly billing invoices

---

[31] *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 925 (3d Cir. 1990); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978).

[32] *Dreiling Millennium Trust II v. Reliant Renal Care, Inc.*, 833 F. Supp. 2d 429, 434 (E.D. Pa. 2011); *see also Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993) (explaining that "the paradigm interference tort" under Pennsylvania law is one "in which a defendant . . . causes a third party to breach its contract with the promisee-plaintiff"); *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. 1994) (explaining that an intentional interference claim must show that "the defendant interfered with the performance of [the] contract by inducing a breach or otherwise causing the third party not to perform").

[33] *See* J.A. at 512.

11

demonstrate that the number of horses he boarded significantly fluctuated over the relevant time period.[34] Moreover, nothing in the record shows that the boarding contract between the Dommels and Mr. McClay *required* Mr. McClay to maintain a certain number of horses at Farm Two. Thus, the Dommels fail to establish that Mr. McClay breached or failed to perform any obligations under the contract and, as a result, fail to establish a cognizable intentional interference of contract claim.

## IV.

For the reasons set forth above, we vacate in part and affirm in part the order of the District Court.

---

[34] J.A. at 1121-39.