637 F.2d 957
 106 L.R.R.M. (BNA) 2225, 90 Lab.Cas. P 12,495,
7 Fed. R. Evid. Serv. 870
 KERRY COAL COMPANY,
v.
UNITED MINE WORKERS OF AMERICA, Arnold Miller, District # 5
of the United Mine Workers of America, Louis A. Antal, Jerry
Ashton, Estel Taylor, James Beachem, Brian Short, John Doe,
Richard Roe, and all others acting in concert or otherwise
participating with them or acting in their aid or behalf.
Appeal of UNITED MINE WORKERS OF AMERICA, in No. 80-1733,
Appeal of Estel TAYLOR, in No. 80-1734,
Appeal of DISTRICT 5, UNITED MINE WORKERS OF AMERICA, in No. 80-1735,
Appeal of Jerry (Gary) ASHTON, Brian Short, et al, in No.
80-1736 (D.C. Civil No. 78-0108).
 Nos. 80-1733, 80-1734, 80-1735 and 80-1736.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 14, 1980.
Decided Jan. 8, 1981.
As Amended Feb. 5, 1981.
Rehearing and Rehearing In Banc Denied Feb. 9, 1981.
 
 Harrison Combs, Gen. Counsel, United Mine Workers of America, Washington, D.C., Lloyd F. Engle, Jr. (argued), Paul M. Puskar, Kuhn, Engle & Stein, Pittsburgh, Pa., for United Mine Workers of America, Estel Taylor, Dist. 5, United Mine Workers of America, appellants in Nos. 80-1733/4/5.
 Melvin L. Vatz (argued), Pittsburgh, Pa., for Jerry (Gary) Ashton and Brian Short, appellants in No. 80-1735.
 John M. Elliott (argued), Stephen C. Braverman, Henry F. Siedzikowski, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for Kerry Coal Co.
 Before GIBBONS and ROSENN, Circuit Judges and HANNUM,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This is an appeal from an order denying defendants' motions for judgment notwithstanding the verdict or for a new trial. The successful plaintiff is Kerry Coal Company (Kerry Coal), a non-union coal producer. The defendants against which verdicts were returned are the United Mine Workers of America (the International), District No. 5 of the United Mine Workers of America (District 5), Estel Taylor, Brian Short, and Jerry Ashton. The trial court, using special verdict interrogatories, submitted three counts of a six count amended complaint to the jury. One of those counts, seeking punitive damages, resulted in a verdict for the defendants, and is not before us. On Count I, in which Kerry Coal sought damages pursuant to section 303 of the Labor Management Relations Act of 1947 for violations of section 8(b)(4) of that Act, the jury returned a verdict of $1,200,000 against the International and District 5.[1] On Count IV, in which Kerry Coal sought damages under Pennsylvania law for interference with its business and contractual relationships, the jury returned a verdict in the same amount against the International, District 5, Taylor, Short, and Ashton. The District Court refused to set these verdicts aside. 488 F.Supp. 1080 (W.D.Pa. 1980). We affirm.
 
 I.
 The Facts
 
 2
 Between December 6, 1977 and March 27, 1978 the International, District 5, and the other local unions of the United Mine Workers engaged in an economic strike against members of the Bituminous Coal Operators' Association, with whom they had a collective bargaining relationship. Kerry Coal, a coal producer whose facilities are located in the region for which District 5 has organizational responsibility, has never had such a bargaining relationship. During a part of the national bituminous coal strike Kerry Coal's facilities were closed down, and at one point partially destroyed. In this lawsuit Kerry Coal seeks to recover for the resulting damage to its business. Viewing all the evidence, and inferences drawn therefrom, in the light most favorable to Kerry Coal, the party with the verdict,[2] the jury could have found on liability as set out hereafter.
 
 
 3
 In November, 1977, prior to the commencement of its economic strike against those operators with which it had a bargaining relationship, District 5 wrote to all other coal operators in its region, charging them with failure to meet area wage and benefit standards. These letters were sent without any knowledge of the actual wages and benefits paid by the non-union operators. Also in November, the District 5 president asked the International to send an International organizer to "survey" the non-union mines in the area. There was never, however, during the strike any attempt to organize Kerry Coal, or, so far as the record discloses, any other non-union coal operator in District 5's region. Two International organizers were sent to the area in November, one of them being Jay Kolenc. Kolenc, the second highest paid organizer of the International, was instructed by the International to stay on "present assignment," and remained in the District 5 region until January 21, 1978. While he was in the District 5 region Kolenc was paid a salary by the International which also reimbursed him for expenses incurred there. Vouchers for those expenses disclose that he and Thomas Pysell, former International Director of Organizing, appeared at non-union mines, and that he met frequently with District 5 Board members.
 
 
 4
 On November 30, 1977 the Executive Board of District 5 met and formally decided to conduct what it referred to as "informational" picketing at non-union mining operations during the anticipated strike. The Board authorized payment from District 5 funds to compensate picketers. Vouchers for such payments contained notations such as "made check on these strips in afternoon after having pickets shut them down" (App. at 1970) and "shut down trucking cos." (App. at 1966), from which the jury could reasonably infer that the picketing was not intended as area standards informational picketing, but was for the purpose of interrupting production at the non-union mines. District 5 had a caravan of 16 roving pickets in the vicinity of Kerry Coal's operations. There was situs picketing at Abrosia Coal Company and Veon Coal Company, non-union operations near Kerry Coal, in early December. Having learned that the picketing at Veon Coal Company was accompanied by violence, Kerry Coal shut down its operations between December 13 and 20, 1977, but then resumed production.
 
 
 5
 On December 27, 1977 Vernon Kerry, president of the plaintiff, was threatened by defendant Ashton, and by a United Mine Workers member, Beachem, that if he did not shut down, they would bring 200 men to wreck his equipment, Beachem adding, "We can do this with one phone call." Ashton, who lived nearby, began situs picketing at Kerry Coal's railroad siding with a sign saying "UMW ON STRIKE NO CONTRACT NO WORK". For the picketing he was paid by District 5. Ashton also called UMW member Lytle to ask for, and was promised, help. After this phone conversation Ashton, Beachem, and Lytle met with Kolenc. Between January 5 and 9 picketing at the rail siding was carried on 24 hours a day. The result was that trains coming to pick up coal did not violate the picket line, and left empty.
 
 
 6
 International organizer Kolenc was an encouraging presence at the picket lines at Kerry Coal's place of business on several occasions between January 5 and 9, when pickets threatened Kerry Coal's employees. Moreover, late in December Kolenc had arranged to put Ashton in touch with Taylor, the District 5 Board member in charge of the sub-district where Kerry Coal was located. Kolenc advised Ashton that he needed instructions about the picketing, and that someone would deliver them. At a later meeting among Ashton, Taylor, and Short, a past local president, Taylor asked Ashton to "scout" the Kerry Coal operation. Ashton did so, and Kolenc accompanied Ashton on the scouting trip. Ashton reported back to Taylor and Short that Kerry Coal was still operating, and a decision was made to institute 24 hour picketing. Kolenc was present at the meetings at which this decision was made and steps taken to implement it.
 
 
 7
 Short, who owned a Ram Charger vehicle, was observed by Vernon Kerry on the Kerry Coal property near the gas pumps. On this occasion Short threatened physical violence if Kerry Coal did not shut down its operations. During the picketing, roofing nails were strewn across the entrance to Kerry Coal's site, and the picketing was accompanied by intimidating gestures toward Kerry's truckers and employees.
 
 
 8
 On January 20, 1978, Taylor, Short, and two other union members drove past Kerry Coal's site and concluded that the company was still working. They then drove to Beaver Falls where they had a breakfast meeting with Kolenc. District 5 paid Short's and Taylor's expenses for the trip. Kolenc abruptly left Pennsylvania the next day. On January 22, 1978, between 3:00 a. m. and 8:00 a. m., extensive damage was done to Kerry Coal's equipment at its loading area. Vernon Kerry, arriving at the scene, observed in the newly fallen snow tire marks which he identified as having been made by Short's Ram Charger. He went in search of Short, encountering him in Library, Pennsylvania, where he accused Short of having been "seen last night." Short's only reply was, "I don't think so." Short then replaced a virtually new set of tires on the Ram Charger. On January 26, after learning what Vernon Kerry had said to Short about someone having been seen wrecking the equipment, Taylor traveled to the area and made inquiries as to possible witnesses.
 
 
 9
 On January 25, 1978, twelve carloads of UMW pickets arrived at Kerry's coal tipple, and, standing shoulder to shoulder, completely blocked access to the premises. Vernon Kerry called the state police, but before their arrival two picketers, identifying themselves as United Mine Workers members, came into his office and told him to stop shipping industrial and electrical utility coal for the duration of the strike. Within five minutes an additional caravan of 80 cars cruised past the Kerry Coal site. Vernon Kerry, frightened, agreed to stop shipping industrial and electrical utility coal. When the police arrived the pickets had left, but the police told Vernon Kerry to get his men out of there, since they could not be protected if the caravan returned.
 
 
 10
 During the course of the strike coal trucks hauling Kerry coal were frequently followed and the drivers harassed. At one regular Kerry Coal customer, St. Joe Mineral Company, pickets threw rocks, damaging the trucks. After the delivery was completed, pickets swarmed at the St. Joe plant gates. Vernon Kerry, his drivers, and his trucks finally escaped under police escort. This delivery, on February 27, 1978, was the last requested by St. Joe for the duration of the strike. District 5 vouchers show payments to pickets at the St. Joe plant.
 
 
 11
 District 5 used its funds for the creation of a legal defense fund to be available to members such as Ashton, Taylor, and Short for legal problems resulting from activity they might engage in during the strike.
 
 
 12
 The defendants offered evidence which would arguably support factual inferences more favorable to them. We emphasize that the foregoing summary is what the jury could, from the evidence, have found.
 
 II.
 The Section 8(b)(4) Charge
 
 13
 Both the International and District 5 contend that they are entitled to a judgment notwithstanding the verdict on the Section 8(b)(4) charge. Neither urges that the picketing, harassment of employees, or destruction of equipment which the jury could have found was lawful protected activity. It is clear that the activity complained of was not primary; that is, that it was aimed at preventing the railroads from handling Kerry coal, and at preventing Kerry from selling coal to industrial and electrical utility customers. Rather, both the International and District 5 contend that, assuming the threats, coercions and restraints occurred, they were not responsible.
 
 
 14
 Section 301(b) of the Labor Management Relations Act, 29 U.S.C. § 185(b), to which section 303 refers, provides that labor organizations shall be bound by the acts of their agents. Moreover "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 185(e). The issue, as to both the International and District 5, is whether mindful of the agency principles referred to in section 301, a jury could find that they should be held liable. A separate analysis must be made for each. Carbon Fuel Co. v. UMW, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).A. District 5
 
 
 15
 Before the strike began, District 5 sent letters to the non-union operators complaining of violations of area standards. A jury could find that these were pretexts for later picketing. District 5 authorized such picketing on November 30, 1977. The Executive Board of District 5 was intimately involved in the secondary activity directed against Kerry Coal. It is undisputed that Taylor, an Executive Board member, had authority to conduct picketing operations on behalf of the District, to approve and submit vouchers for picket travel and meal allowances, and to see to their payment. It is undisputed that Taylor authorized the establishment of a picket line at Kerry Coal between January 5 and 9, 1978, and that the District paid the pickets. Moreover, the District paid Ashton for earlier picketing, and paid Taylor and Short for the expenses incurred in their scouting expedition on January 20, 1978, a short time before Kerry Coal's equipment was sabotaged. There is, besides, the evidence of massive concert of action by stationary and roving pickets in the region of District 5's responsibility, and of similar concert of action by stationary pickets at the place of business of a Kerry Coal customer. There is ample evidence of meetings among officials of District 5 at which the picketing of Kerry Coal was discussed and set in motion. Short of a certified copy of a resolution by the full membership of District 5, it would be difficult to imagine evidence more strongly suggesting that Ashton, Short, and Taylor were acting as agents for District 5, carrying out its decision to engage in secondary activity directed at Kerry Coal. There was ample evidence justifying the submission of the agency issue to the jury, and a judgment notwithstanding the verdict would be clearly improper.
 
 
 16
 District 5 also urges that because no Kerry Coal employees actually stopped working and no Kerry Coal customers actually ceased doing business with it, no section 8(b)(4) violation was shown. That contention flies in the face of the record evidence supporting the jury's award of damages, discussed hereafter. But more significantly, it is irrelevant. There is ample evidence of secondary coercive activity, and it is such activity that section 8(b)(4) proscribes.
 
 B. The International
 
 17
 Liability of the International for the section 8(b)(4) violation depends upon the jury's assessment of the role of Kolenc. Relying on Carbon Fuel Co. v. UMW, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), the International urges that it cannot be held responsible for the acts of Ashton, Taylor, Short, or the other pickets absent evidence that it "instigated, supported, ratified, or encouraged" the picketing activities. That is undoubtedly the correct legal standard for measuring the International's liability. But when considering the propriety of a judgment notwithstanding the verdict, our task is to determine whether, considering all the evidence, a rational factfinder could infer such instigation, support, ratification, or encouragement. The task can be broken down further by asking (1) could the jury find that Kolenc instigated, supported, ratified, or encouraged the activity complained of, and (2) if so, was he acting for the International?
 
 
 18
 The answer to the first question is simple. Kolenc could be found to be not only an active participant, but one of the prime movers in the activity directed against Kerry Coal. Kolenc put Ashton in touch with Taylor, scouted the Kerry Coal operation with Ashton, attended the meetings of District 5 officials at which the decision to picket Kerry Coal, and the implementation of that decision, were discussed, was present at the Kerry Coal site during the picketing, met with Taylor and Short after their January 20, 1978 scouting expedition, and left the area shortly after that meeting and immediately before Kerry Coal's equipment was vandalized.
 
 
 19
 But was Kolenc, while involved quite directly in the secondary activity against Kerry Coal, acting as an agent for the International? In November, about the same time District 5 was making the decision to engage in picketing of the non-union coal operators, its president asked the president of the International to send an organizer to "survey" those operators. The International sent Kolenc, its second highest paid organizer. The International suggests that the "survey" was for the innocent purpose of determining whether the non-union operators were doing a sufficiently large volume of business to be able to pay UMW standard wages and benefits. The jury did not have to credit this explanation, however, especially in the absence of any evidence of organizational activity in the District 5 region during the strike. The only evidence with respect to Kolenc's activity was that relating to his participation in the secondary activity directed against Kerry Coal. The International paid his salary during the time he was in the District 5 region, and paid his expense vouchers for traveling to the Kerry Coal situs. No organizational effort was made there. There is no record evidence that in the critical time period Kolenc submitted vouchers for organizational as distinct from secondary picketing activity. Finally, it can reasonably be inferred, and undoubtedly was, that the International and District 5 shared a common economic interest in interruption of the flow of non-union industrial and electrical utility coal while the strike continued.
 
 
 20
 While the evidence of Kolenc's status as an agent of the International is not as overwhelming as is that of the status of Ashton, Taylor, and Short as agents of District 5, we conclude that there was enough to go to the jury. From the collection of circumstances outlined above a reasonable fact finder could infer that the president of the International sent Kolenc to District 5 not for an organizational purpose, but in order to assist that district in interrupting the flow of non-union coal during the impending strike, and that Kolenc had authority to support and encourage, if not facilitate, Ashton's, Taylor's, and Short's actions against Kerry Coal. On this record a jury, one supposes, could have concluded that Kolenc was off on a frolic of his own. The jury did not do so, and it was not compelled to do so. The International's motion for judgment notwithstanding the verdict on the section 8(b)(4) claims was properly denied.
 
 III.
 The Pennsylvania Interference Charge
 
 21
 The International, District 5, and the three individual appellants, Ashton, Taylor, and Short, all contend that the court erred in failing to grant a judgment notwithstanding the verdict on Kerry Coal's Pennsylvania law claim of intentional interference with contractual relationships. Pennsylvania has adopted the standard of the Restatement (Second) of Torts § 766.[3] See Franklin Music Co. v. American Broadcasting Cos., 616 F.2d 528 (3d Cir. 1979); Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175 (1978). The parties agree that in pursuing such a state law claim against members of a labor organization, the "clear proof" standard of proof of section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, applies. UMW v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court instructed the jury that it must find by clear proof actual participation or actual authorization of violent acts. Thus the case comes before us in the posture that the jury was satisfied there was clear proof of such tortious interference. Once the jury has been properly charged as to the governing standard of proof, our role in assessing the propriety of a judgment notwithstanding the verdict is no different in such a case than in any other.
 
 
 22
 Our conclusion that the liability verdict against the International and District 5 for the section 8(b)(4) claim must stand makes any discussion of the tortious interference verdict against those defendants somewhat of an academic exercise. But since further review is at least possible, we note that the same evidence which sustains the verdict on the section 8(b)(4) claim sustains that based on Pennsylvania law. There was evidence of threats and intimidation against Kerry Coal's workforce, and of violence to its equipment, directed at preventing Kerry Coal from fulfilling its contractual obligations to its customers. There was also evidence of similar intimidation and violence directed at Kerry Coal's truckers and at least one of its customers, St. Joe Mineral Company. The state law claim against the International and District 5 arose, moreover, out of the same operative facts as did the section 8(b)(4) claim. UMW v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus the motion by these defendants for judgment notwithstanding the verdict on the tortious interference claim was properly denied.
 
 
 23
 The contentions of the individual defendants require a somewhat more specific treatment. They, too, urge that the evidence against them was insufficient as a matter of law. Extended discussion of that contention need not detain us. The jury could have found that Ashton, Taylor, and Short acted in concert and separately to interfere with Kerry Coal's delivery of coal.
 
 
 24
 Ashton, Taylor, and Short also contend, however, that the district court lacked subject matter jurisdiction of the state law claim asserted against them. They quite correctly point out that, as individual union members, they were not proper defendants in the section 303(b) suit against the International and District 5. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). Since this was so, even though the state law claim arose out of the same operative facts as that for which section 303 conferred jurisdiction, they are, so they urge, at best pendent parties as to whom there exists no independent basis for federal jurisdiction. See Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).
 
 
 25
 The conclusion that section 303(b) jurisdiction is insufficient, absent some other federal question jurisdiction, to sustain a pendent state law claim against individual union members may be sound. The premise, however, that there was no other basis for federal question jurisdiction against the individual defendants is on this record unsound. Kerry Coal also pleaded a non-frivolous federal claim against the individual defendants under 42 U.S.C. § 1985 as well as a federal claim that the individuals were as a matter of federal common law liable for exemplary and punitive damages for wanton and willful violations of section 8(b)(4). These claims against the defendants were of "sufficient substance to confer subject matter jurisdiction on the court." Lentino v. Fringe Employee Plans, Inc., 611 F.2d 474, 478 (3d Cir. 1979). See also Gagliardi v. Flint, 564 F.2d 112 (3d Cir. 1977). Shortly before trial these claims against the individual defendants were dismissed on motion. The dismissal was not, however, final. The "(c)onstitutional power to adjudicate a pendent claim is ordinarily to be determined by reference to the pleadings, not on the facts as they may eventually be established." Lentino v. Fringe Employee Plans, Inc., supra, at 478, citing Elberti v. Kunsman, 376 F.2d 567, 568 (3d Cir. 1967). See also UMW v. Gibbs, 383 U.S. at 727, 86 S.Ct. at 1139, 16 L.Ed.2d 218.
 
 
 26
 Had the trial court, when it dismissed the federal law claims against the individual defendants, been presented with a motion for dismissal of the pendent state law claim against them, we suppose that such a dismissal would have been a permissible exercise of that court's discretion. No such motion was made. Instead the individual defendants gambled on trying the state law claim to a federal jury, and only long after the verdict raised the objection that it should have been dismissed in an amended motion for a judgment notwithstanding the verdict. In such circumstances we cannot say that refusing to grant a motion for judgment notwithstanding the verdict was error. Indeed, since there was an independent basis for federal question jurisdiction over the individual defendants, and the jury returned a verdict, a discretionary dismissal at that point probably would violate the seventh amendment.
 
 IV.
 Damages
 
 27
 All defendants contend that the verdict of $1,200,000 in damages must be set aside. Ashton and Short argue that the award was the product of jury passion induced by the inflammatory remarks of plaintiff's counsel. We will consider that contention in dealing with the defendants' new trial motions. The common argument is that there is no evidentiary support for the award. The argument is twofold: that there is no proof of lost sales; and that if there is proof of lost sales, there is no proof that the defendants' activities caused the decline.
 
 
 28
 Kerry Coal's theory of damage was that as a non-union coal producer of industrial and electrical utility coal operating during a national bituminous coal strike it could have sold at market price all the coal it could ship. Its accounting expert, Kilger, determined maximum sales on the basis of shipments made during the month of February, when the defendants' activities were at a low level, and calculated the discrepancy when such activities were more intense. The expert then calculated profits lost on such lost sales. From Kerry Coal's books and records in evidence he also calculated excess costs incurred for nonproductive labor when shipments were interrupted, lost interest income on profits on lost sales, and out-of-pocket expenses for items such as repair of damaged equipment, replacement of such equipment, and the cost of additional security guards. He included, finally, attorneys fees expended in obtaining a state court injunction against the defendants.
 
 
 29
 The defendants do not contend that the items of damage Kilger identified are not recoverable in a section 8(b)(4) action or in an action for tortious interference with business relationships. Rather, they contend, the evidence on lost profits was insufficient because it failed to establish lost sales to specific customers, and because it failed to tie such specific lost sales to their activities. We reject this contention.[4] The jury was presented with a reasonable basis from which it could find both the amount of Kerry Coal's lost sales during the national bituminous coal strike and the causal relationship between those lost sales and the defendants' activities. No more was required.
 
 
 30
 Finally, some defendants take issue with Kilger's calculations with respect to the amount of coal in Kerry Coal's stockpile at the beginning of the relevant period. This contention is at best a jury issue, and was so argued in the trial.
 
 
 31
 We conclude that the question of Kerry Coal's damage was properly submitted to the jury, and that there is a sufficient evidentiary basis for its verdict of $1,200,000.
 
 V.
 The New Trial Motion
 
 32
 The same defendants contend that various trial court rulings require a new trial. We turn to those contentions.
 
 
 33
 A. The Wording of the Special Verdict Interrogatories
 
 
 34
 The International and District 5 contend that the wording of the special verdict interrogatories on the section 8(b)(4) claim allowed the jury to find a violation of that statute without finding that the object was to force Kerry Coal to cease doing business with another person.[5] Our review of the record discloses, however, that the special verdict interrogatories were not objected to on this ground. Moreover the defendants do not contend that the court's jury instruction was in any way incorrect with respect to the elements of a section 8(b)(4) violation. The trial court did not err in rejecting this ground for a new trial.
 
 B. Denial of a Mistrial Motion
 
 35
 During the plaintiff's closing argument to the jury Kerry Coal's counsel stated:
 
 
 36
 The Veon Coal Company right next to the Kerry Coal Company was hit with violence on December the 12th. We closed down December the 13th. Short was at Veon. Taylor was at Veon. Do we have to Then they destroy Veon's equipment, and he tells you there is no causal relationship between us closing on the 13th and what went on at Veon. (App. at 1575).
 
 
 37
 Defendants did not object to plaintiff's argument in the motion for new trial. Three months after the verdict they contended that this argument suggested that Short and Taylor, who were at Veon at the time referred to, were responsible for destruction of Veon equipment. There is no direct evidence that they were. Entirely aside from the untimeliness of the objection and mistrial motion, however, the quoted argument is not a ground for a mistrial. There is evidence that Veon's equipment was damaged, that Vernon Kerry heard of the damage by citizens band radio, and evidence from which a jury could infer that Short and Taylor were at the Veon site when the damage occurred. It was certainly legitimate to argue to the jury that Vernon Kerry had reasonable cause to believe they may have been responsible, and he had reasonable cause to fear.
 
 
 38
 It is the quoted argument upon which Ashton and Short rely for the contention that the damage verdict was the result of jury passion. This argument is frivolous.
 
 C. Evidentiary Rulings
 
 39
 The defendants contend that the trial court erred in permitting Vernon Kerry to testify that Kerry Coal's employees were, following defendants' coercive actions, nervous and afraid. The trial court ruled, correctly, that Vernon Kerry's testimony was merely a shorthand report of his observations of employee reactions.
 
 
 40
 The defendants Ashton and Short also contend that the court improperly admitted evidence of the payment of their legal fees out of a fund which, the jury could find, originated with District 5. Admission of this evidence was a discretionary relevance ruling under Federal Rule of Evidence 403.
 
 VI.
 Conclusion
 
 41
 A judgment of $1,200,000 against an international union, one of its area subdivisions, and three individual members poses for us a serious matter requiring careful scrutiny. The respective roles of judge and jury, however, are not different in such a case than in any other civil action. Reviewing the record by the strict standard appropriate for a motion for judgment notwithstanding the verdict, we can find no justification for the grant of such a motion. Nor do we find any abuse of discretion in the trial court's ruling on the defendants' motion for a new trial. The judgment appealed from will be affirmed.
 
 
 
 *
 Honorable John B. Hannum, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Section 303 provides:
 (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended.
 (b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
 29 U.S.C. § 187 (1976).
 Section 8(b)(4) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
 (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:
 Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; ....
 29 U.S.C. § 158(b)(4) (1976).
 
 
 [2]
 E.g., Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc), citing Kademenos v. Equitable Life Assurance Society, 513 F.2d 1073, 1074 (3d Cir. 1975)
 
 
 [3]
 The Restatement (Second) of Torts provides:
 One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
 Restatement (Second) of Torts § 766.
 
 
 [4]
 Kerry Coal points out that this contention was neither presented to nor considered by the trial court. The trial court did conclude, however, that there was sufficient evidence to sustain the damage award. Thus we have considered the contention on the assumption that in the court's view it may have been presented
 
 
 [5]
 The challenged phrases are similar to those in special interrogatories 1 and 2:
 
 
 [1]
 Did the United Mine Workers of America (International) induce or encourage one or more employees of the Kerry Coal Company, or of the trucking companies hauling for Kerry Coal Company, or of the Railroad to refuse to process, transport, or handle Kerry coal?
 
 
 [2]
 Was an object of the aforementioned conduct by the International to require or force the employer, Kerry Coal Company, to cease doing business, or the trucking companies hauling Kerry coal, or the Railroad to cease processing, transporting, or handling Kerry coal?
 Opinion of the district court, App. at 1598 n.1.