NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-1619, 11-1620, 11-1621, 11-1622
_____

FRANK McCANN; EILEEN McCANN, H/W;
FRANK TROTTI; TONIA TROTTI, H/W;
JEFF OSBORNE; TIMOTHY GRANDFIELD; JOSEPH CARBONE

v.

STEVE MILLER, Grand Lodge Representative,
International Association of Machinists and Aerospace Workers;
INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS;
THOMAS BUFFENBARGER, President,
International Association of Machinists and Aerospace Workers;
INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS  LOCAL 1776;
ROBERT ROACH, General Vice President,
International Association of Machinists;
LYNN TUCKER, General Vice President,
International Association of Machinists and Aerospace Workers;
DAVID MESSER; KENNETH MILLARD; JERRY MOLINARI;
JACK JOHNSON; PATRICK STACK; JAMES STROUSE;
VINCENT TROIL; JOHN DORAN; WAYNE GALLAGHER;
JOEL HEITMAN; RICHARD HOWELL; EDWARD LONGWELL;
JAMES LUX; JASON McGUIGAN; ANTHONY ARMIDEO;
MARK BIONI; ROBERT BOLAND; ROBERT CARR;
VINCENT CERASO; JON CONNER; MICHAEL DEJESSE;
PHILADELPHIA AIRPORT HOTEL LIMITED PARTNERSHIP;
MARRIOTT HOTEL SERVICES, INC.;
ELPIZIO LIMITED PARTNERSHIP; DAVID STRANGE

Frank McCann and Eileen McCann,
Appellants at No. 11-1619

Jeffrey Osborne,
Appellant at No. 11-1620

Frank Trotti; Jeffrey Osborne; Joseph Carbon; Timothy Granfield,
Appellants at No. 11-1621

International Association of Machinists and
Aerospace Workers Local Lodge 1776,
Appellant at No. 11-1622
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 08-cv-00561
(Honorable Mitchell S. Goldberg)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 10, 2012

Before:  SCIRICA, ROTH and BARRY, *Circuit Judges*.

(Filed: October 22, 2012)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

These consolidated cases appeal judgments and orders in a civil action brought by

union members against members of a rival union and the union's local and international

branches to recover for injuries suffered in a physical attack at a union meeting in

Philadelphia. After trial, the jury returned a verdict for plaintiffs, finding several

individual union members and the local union liable for over $800,000 in damages.[1] But

all plaintiffs (Frank and Eileen McCann, Frank Trotti, Joseph Carbon, Timothy

---

[1] The jury awarded $211,492.81 to Frank McCann, $111,400.90 to Frank Trotti,
$276,683.51 to Jeff Osborne, $158,997.93 to Timothy Grandfield, and $53,403.00 to
Joseph Carbon.

Grandfield, and Jeff Osborne) appeal the court's grant of summary judgment to the International Association of Machinists and Aerospace Workers ("IAM" or "Grand Lodge"), and some challenge the court's decision to bifurcate the trial. Plaintiff Jeff Osborne separately appeals the court's exclusion of expert medical testimony on causation and prognosis for injuries he suffered in the attack. Defendant Local Lodge 1776, which represents Philadelphia-area members of the IAM, appeals the District Court's denial of its motions for judgment as a matter of law and, in the alternative, for a new trial. We will affirm the District Court on each of these issues.

## I.

This litigation arises out of a conflict between two unions—the IAM and the Transport Workers Union (TWU)—over union representation of airline employees following the merger of U.S. Airways and America West. Prior to the merger, U.S. Airways employees were primarily represented by the IAM and America West employees by the TWU. In anticipation of the merger, plaintiffs, who were union organizers for the TWU, sought to recruit new members by holding several informational meetings. On the morning of February 8, 2006, shortly before one of these meetings, a group affiliated with the IAM threatened and then assaulted plaintiffs in a conference room at the Philadelphia Airport Marriott. Several TWU members were injured.

The IAM is structured in three tiers. The top tier is known as the Grand Lodge. The intermediate tier is comprised of several regional District Lodges. The lowest tier is made up of over one thousand Local Lodges. Each District and Local Lodge is a separate

and autonomous entity, with its own officers, governance, and treasury; they are not authorized to speak or act on behalf of the IAM.

The injured TWU members brought this suit against the individual IAM members who allegedly planned or participated in the attack as well as the local entity of the IAM to which the attackers belonged, Local Lodge 1776 ("Local 1776"), and the Grand Lodge of the IAM. These consolidated appeals challenge the judgments and orders of the District Court at several stages of the ensuing civil proceedings.

After discovery, the parties filed cross-motions for summary judgment. The District Court determined that the Grand Lodge of the IAM could not be held liable for the attack under the Norris-LaGuardia Act's heightened vicarious liability standard, but left the question of Local 1776's vicarious liability to the jury. Plaintiffs appeal the grant of summary judgment in favor of the IAM.

Shortly before trial, Osborne notified defendants that he intended to have his treating physicians offer expert testimony on causation and prognosis. Defendants objected because of late notice. The court excluded the expert testimony and Osborne appeals.

At the close of trial, the verdict sheet adopted by the District Court charged the jury to determine whether Local 1776 was liable for punitive damages, leaving the amount of punitive damages, if any were warranted, to be determined after a second trial before the same jury. The jury found Local 1776 liable for the plaintiffs' injuries, but found punitive damages unwarranted. Trotti had opposed this bifurcation and now appeals.

4

After the verdict, Local 1776 filed motions for judgment as a matter of law under Fed. R. Civ. P. 50 and for a new trial under Rule 59(b). Concluding that the evidence supported the verdict, the District Court denied these motions. Local 1776 appeals.[2]

## II.

## A.

Plaintiffs argue the District Court erred in granting summary judgment in favor of the IAM because they presented sufficient evidence for a jury to find it vicariously liable for the attack. We review the grant of summary judgment de novo, drawing all inferences in favor of the nonmoving party. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citation omitted).

McCann contends the court erred in applying the heightened burden of proof of Section 6 of the Norris-LaGuardia Act ("NLA"), 29 U.S.C. § 106, in assessing the liability of the IAM at summary judgment. But the court correctly determined that to establish the IAM's liability for the tort claims here the plaintiffs must meet the NLA's heightened evidentiary standard. Section 6 of the NLA governs the liability of unions for the actions of union members in federal adjudications of state law tort claims arising out of labor disputes.[3] *United Mine Workers v. Gibbs*, 383 U.S. 715, 737 (1966). Because

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

[3] According to McCann, the clear proof standard is inapplicable because of the subsequent passage of the Labor Management Relations Act ("LMRA"), which purportedly restored the ordinary standard of agency, implicitly repealing the heightened § 6 standard. But in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), the Supreme Court explained that "[Congress] did not repeal § 6 outright, but left it applicable to cases not arising under the new Act . . . . Plainly, § 6 applies to federal court adjudications of

5

plaintiffs' claims rest solely on state tort law and arise out of a labor dispute, they are plainly covered by § 6. Nevertheless, McCann contends that once a local union—like Local 1776 here—has been found vicariously liable under § 6, the international union can be held vicariously liable under a simple preponderance of the evidence standard. We find no support for this proposition in case law and decline to embrace it here.[4] The question is not whether the IAM can be held liable for the actions of the Local, but whether the IAM can be held liable for the actions of the individual members who participated in the attack. Section 6 of the NLA governs the liability of the IAM for the actions of its members.

Under Section 6, a plaintiff must show by "clear proof" that the defendant organization or member "actually participated, gave prior authorization, or ratified [the offense] after actual knowledge of [its] perpetration." *United Bhd. of Carpenters v. United States*, 330 U.S. 395, 403 (1947). To establish authorization, plaintiffs must prove "that the particular act charged," or acts like it, "had been expressly authorized, or necessarily followed from a granted authority." *Id.* at 406-07. To establish ratification, plaintiffs must show "either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their

---

state tort claims arising out of labor disputes, whether or not they are associated with claims under [LMRA] § 303 to which the section does not apply." *Id.* at 736-37; *see also C & K Coal Co. v. United Mine Workers*, 704 F.2d 690, 694-95 (3d Cir. 1983); *Kerry Coal Co. v. United Mine Workers*, 637 F.2d 957, 964 (3d Cir. 1981).

[4]  In support of this argument, McCann cites only a footnote in *Gibbs*. But the footnote does not endorse the argument, rather it merely acknowledges that the "argument might be made." 383 U.S. at 737 n.28.

force." *Gibbs*, 383 U.S. at 739. On summary judgment, the court must determine whether the evidence presented would allow a jury to reasonably find for the plaintiff or defendant under this heightened evidentiary standard.[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005) (citation omitted).

Even under the NLA's heightened burden, plaintiffs contend they presented sufficient evidence to create a question of fact on IAM's liability. There is some case law that a union may authorize or ratify an act "without going so far as to openly encourage or embrace the tactics of its official representative." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local*, 883 F.2d 132, 136 (D.C. Cir. 1989). And "'proof of authorization or ratification can be based upon circumstantial evidence,'" provided that proof is clear. *Id.* (quoting *James R. Snyder Co. v. Edward Rose & Sons, Inc.*, 546 F.2d 206 (6th Cir. 1976)). As the District Court found, however, the evidence was insufficient to allow a jury to find, by "clear proof," that the IAM had participated in, authorized, or ratified the attack.

---

[5] Trotti cites our decision in *Altemose Constr. Co. v. Bldg. & Constr. Trades Council*, 751 F.2d 653, 655-56 (3d Cir. 1985), for the proposition that on summary judgment the inquiry for liability under the NLA is limited to whether inferences "of union authorization, participation in, or ratification of the acts complained of . . . are, under the evidence, logically permissible." But the Supreme Court has since held that where a heightened evidentiary standard would apply at trial, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Accordingly, the question is whether the evidence would logically support a jury's finding of authorization, participation, or ratification "by clear proof." This is the question the District Court asked.

Plaintiffs claim that in reaching this conclusion the court ignored much of the circumstantial evidence and failed to consider the cumulative impact of the totality of the evidence they submitted. According to plaintiffs, that evidence, considered as a whole, would permit a jury to find vicarious liability under the NLA. Plaintiffs' argument centers on the role of four individuals in the events surrounding the attack: Vincent Addeo and Anthony Armideo, both credentialed representatives of the IAM who were present at the Marriott hotel on the day of the attack; Steven Miller, a vice president of District Lodge 141, who allegedly threatened plaintiffs some days prior to the attack; and Robert Boland, president of Local 1776.

Plaintiffs argue a reasonable jury could conclude Miller, Armideo, and Addeo were acting on behalf of the IAM and therefore the IAM authorized or participated in the attack on plaintiffs. Starting with Miller, plaintiffs point to testimony that, two days before the attack, he warned Osborne, Carbon, and McCann at a meeting in Boston that if they went to Philadelphia they would need bullet proof vests and would be "lucky to get out of there alive." App. 654, 910, 920, 940-41. But, plaintiffs failed to establish a link between these alleged threats and the Grand Lodge of the IAM. The only evidence in the record demonstrates that Miller "never received instructions from anyone in the Grand Lodge about the Boston meeting," App. at 264, 558, and attended the meeting on behalf of District Lodge 141. Accordingly, there is no evidence Miller was acting on behalf of the IAM.

Nor is there evidence Armideo was acting on behalf of the IAM. McCann asserts that Roach, an IAM vice president, had delegated to Stephen Canale, the president of

8

District Lodge 141, the task of combating the Teamsters and TWU organizing efforts, who in turn delegated that task to Armideo. McCann Br. at 11. While it is true that Canale had assigned Armideo to work on the TWU campaign, the record contains no evidence that any officer of the Grand Lodge had delegated this responsibility to Canale. The fact that Armideo introduced himself as an IAM representative is not evidence he was acting on behalf of the IAM. At issue is Armideo's actual authority, not his apparent authority. [6]

That Armideo carried an IAM credential card similarly does not establish that he acted on behalf of the Grand Lodge in this instance. The credential states that the carrier "is duly authorized to represent the Grand Lodge . . . in all matters to which he/she may be assigned . . . ." App. at 314. But, as the District Court noted, there is no evidence Armideo had been assigned to represent the Grand Lodge in the union dispute that resulted in the February 8 attack.

Plaintiffs' evidence regarding Addeo is stronger, but still insufficient. First, as just discussed, the fact Addeo carried an IAM credential card is not evidence he was acting on behalf of the IAM in this instance. Next, plaintiffs point to a letter from Robert Roach, Jr., an IAM General Vice President, authorizing Addeo to act with the full authority of the IAM in preventing a raid by the Teamsters Organization. As the District Court noted, however, this letter was expressly limited to a conflict with the Teamsters union, not the TWU. It did not confer a general authority on Addeo to combat any organizing efforts by

---

[6] The parties dispute whether this statement was inadmissible hearsay if offered to show that Armideo was in fact an IAM representative. IAM Br. at 42.

9

opposing unions. Nevertheless, plaintiffs contend this letter is evidence IAM authorized or participated in the attack because a reasonable jury could infer the letter implicitly gave Addeo authority to combat the organizing efforts of the TWU, which were related to the efforts of the Teamsters.

Plaintiffs also argue Addeo's invocation of his Fifth Amendment rights during his deposition when asked about his role in the assault gives rise to the inference that he was protecting the IAM. Only one of these questions - with whom he spoke at the Grand Lodge about the attack - had anything to do with the IAM. But even these strained inferences cannot constitute clear proof IAM authorized or participated in the attack.

Plaintiffs also argue that IAM should be held liable on a ratification theory, contending its failure to discipline Boland and Armideo and retaining them in union positions after their arrest in connection with the February 8 attack proves the union ratified the attack. To bolster this theory, McCann argues that keeping Armideo and Boland in office violates 29 U.S.C. § 504, which prohibits, *inter alia*, persons convicted of assault resulting in grievous bodily injury from holding union positions. This argument fails. First, the prohibition in 29 U.S.C. § 504 applies to convictions for assaults resulting in grievous bodily injury, such as aggravated assault under Pennsylvania law. *See* 18 Pa. Cons. Stat. § 2702. Boland and Armideo were convicted of simple assault, a crime without the element of grievous bodily injury. *See* 18 Pa. Cons. Stat. § 2701. Moreover, the union's failure to discipline the pair is an internal union matter, *see United Steelworkers v. Lorain*, 616 F.2d 919, 923 (6th Cir. 1980), and does not constitute clear proof "that the union approved the violence which occurred." *Gibbs*, 383 U.S. at 739.

10

The IAM asserts its failure to discipline these members was based on the constraints on union discipline imposed by the LMRDA, 29 U.S.C. §§ 411(a)(5), 529, and the provisions of the IAM Constitution, App. at 567. Plaintiffs point to no evidence indicating the actual reason for the union's failure to discipline was its approval of the February 8 attack.

Nor do the other facts cited in the plaintiffs' briefs preclude summary judgment in favor of the IAM. We conclude the plaintiffs presented insufficient evidence to allow a jury to find the IAM vicariously liable under the NLA's clear proof standard. The District Court gave close consideration to the plaintiffs' evidence and properly concluded the evidence fell short.

**B.**

For its part, Local 1776 appeals the District Court's denial of its motion for judgment as a matter of law under Fed. R. Civ. P. 50, contending the evidence did not support the jury's finding of vicarious liability. Judgment as a matter of law is proper only where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In entertaining a Rule 50 motion, a court should review the record as a whole, but disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted

11

and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotation marks and citation omitted).

Local 1776 contends the court erred in stating that the evidentiary burden for establishing liability under § 6 of the NLA required "clear proof," when the jury charge stated a standard of "clear and convincing evidence" and the Supreme Court has referred to the standard as being "clear, unequivocal and convincing." *Gibbs*, 383 U.S. at 737. But "clear proof" is the precise language of the statute; it is the applicable standard. The alternative formulations of this standard in the jury charge and in *Gibbs* were offered as synonyms of "clear proof." We find no indication that the jury or District Court applied the wrong standard.

Local 1776 also contends the record as a whole did not contain evidence sufficient to support the jury's finding of liability. According to Local 1776, the District Court was dismissive of the uncontradicted and unimpeached evidence in its favor and gave too much weight, in particular, to evidence establishing that Boland was president of Local 1776.[7] Yet in making this argument on appeal, Local 1776 largely relies on testimony

---

[7] Local 1776 takes issue with the District Court's determination that "[t]he jury was not required to ignore the fact that Boland was also President of Local 1776, and that those who were taken out of work and involved in the assault were members of Local 1776." App. at 47. Apparently, Local 1776 would have the jury ignore this evidence because it does not establish that Local 1776 authorized "the particular act charged, or acts generally of that type and quality." *See Carpenters*, 330 U.S. at 406-07. But to say that certain evidence does not by itself establish authorization is quite different from saying the evidence ought to be ignored. This evidence lent support to the jury's conclusion that Local 1776 had authorized the attack.

offered by an interested witness or contradicted elsewhere in the record.[8]

Local 1776 also points to a purported contradiction between the jury's finding the individual defendants had exhibited extreme and outrageous conduct and its finding Local 1776, while liable, had not acted in an outrageous, malicious, wanton, willful, oppressive, or recklessly indifferent manner. These two findings are not necessarily mutually exclusive. In ruling on defendant's motion for judgment as a matter of law, the District Court carefully reviewed the record and found the evidence sufficient to support the jury's conclusion that Local 1776 was liable. We agree.

We also affirm the denial of Local 1776's motion for a new trial. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). There is nothing shocking in the jury finding Local 1776 liable for plaintiffs' injuries. As the District Court held, that conclusion had ample support in the record.

---

[8] For example, in arguing that during the events surrounding the February 8 attack Boland acted on behalf of District Lodge 141 rather than Local 1776, Local 1776 cites evidence showing that Boland was the chief steward of District Lodge 141. Local 1776 Br. at 27 (citing App. at 1552-53). But in his own testimony, Boland twice stated that he never held a position with District Lodge 141. App. at 1730, 1738. Moreover, much of the testimony cited by Local 1776 in this appeal was offered by an interested witness, Armideo, whom the jury was not required to believe. *See Reeves*, 530 U.S. at 151. The Local claims that Armideo's testimony should not be discounted as that of an interested witness because his self-interest as a codefendant facing a large judgment would favor imposing liability on Local 1776. But we need not parse how competing interests might have influenced Armideo's testimony. That task was properly left to the jury.

## C.

Trotti argues the District Court erred in bifurcating the question of liability for punitive damages from the amount of punitive damages. At the close of the trial, Trotti contested the bifurcation of these questions and requested that the jury consider the questions simultaneously.

We review the decision to bifurcate the trial for abuse of discretion. *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 105 (3d Cir. 1992) (citation omitted). Here, the court was understandably concerned that the jury's knowledge of the defendant's net worth might influence its assessment of compensatory damages. While a defendant's net worth is relevant in assessing the amount of punitive damages, it should not bear on compensatory damages. In this case, Local 1776 hoped to present evidence of its meager assets. To forestall possible confusion or prejudice, the court bifurcated the trial. App. at 1496. We see no abuse of discretion.

Trotti also argues that, in granting the motion to bifurcate the punitive damages issue, the court should have informed the jury that, if it was necessary, the trial on the amount of punitive damages would be very brief. The court declined, explaining that it believed the jury instructions had been clear and that it did not wish to overemphasize the punitive damages aspect of the case. We see no abuse of discretion.

## D.

Finally, we consider Osborne's challenge to the District Court's exclusion of expert testimony by his treating physicians on causation and prognosis for his injuries. Under Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose to the other parties the identity

14

of any witness it may use at trial to present [expert evidence]." As the court noted, plaintiffs' counsel failed to notify defense counsel that treating physicians would offer expert testimony. App. at 26-27. "'The trial court's exclusion of testimony because of the failure of counsel to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion.'" *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (quoting *Semper v. Santos*, 845 F.2d 1233, 1238 (3d Cir. 1988)). To determine whether a district court abused its discretion, we consider:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or wilfulness in failing to comply with the district court's order.

*Id.* (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977)). In addition to these factors, we consider "the importance of the excluded testimony[,] . . . [for] the exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Id.* (internal quotation marks and citations omitted).

Defendants would have faced substantial prejudice if the expert testimony were permitted because plaintiffs did not notify them of their intent to call the treating physicians as expert witnesses until shortly before trial. Defendants did not have time to depose the proposed experts nor find their own experts to rebut the proposed testimony. On these facts, the trial judge was not obliged to postpone the trial. Significantly, the District Court did not bar the treating physicians from offering any testimony. The court

permitted the physicians to testify on "their observations, information they received from their patients, . . . the extent of their examination," and their diagnoses. App. at 28.

Nevertheless, Osborne contends the expert testimony should not have been excluded without considering whether he had substantial justification for failing to comply with the disclosure requirements, citing conflicting authority on whether a treating physician must submit a report that satisfies the expert witness requirements of Rule 26.[9] But he had no justification for failing to disclose that he intended to have the treating physicians offer expert testimony. Rule 26(a)(2)(A) unambiguously required that disclosure.

"[W]e have generally upheld trial courts' imposition of sanctions excluding witnesses because of the district court's need for broad leeway to manage its cases," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 792 (3d Cir. 1994) (citations omitted), and the wisdom of this general rule applies here. The District Court did not abuse its discretion in barring the causation and prognosis testimony of Osborne's treating physicians.

**III.**

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[9] *See* Fed. R. Civ. P. 26(a)(2)(B) (mandating that a written report accompany the expert disclosure "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.").

16