**The Mader Group, Inc. v. Gekoski**

*C. Oliver Burt, III*, for plaintiff.
*Jeffrey B. Albert*, for defendant.

KING, *J.*, September 24, 1981—

### FINDINGS OF FACT

1. Plaintiff, The Mader Group, Incorporated, is a Pennsylvania Corporation with its principal place of business at One Station Circle, Narberth, Pa.

2. Defendant, Joseph H. Gekoski, is an incorporator and President of defendant, Strategic Management Group, Incorporated, hereinafter referred to as SMG.

3. Defendant, Michael B. Aronson, is an incorporator, a principal owner and Vice President of SMG.

4. Defendant SMG is a corporation incorporated on or about June 22, 1981, by defendants Gekoski and Aronson and is engaged in the same business as plaintiff Mader Group.

5. Plaintiff Mader Group is in the business of providing "customer seminars, video based programs, computerized management simulations and consulting services" to corporations in various industries and business activities in the United States and other countries.

6. Plaintiff Mader Group was founded by the late Christopher Mader in or about 1976, and since its founding, has specialized in the area of executive education, with emphasis on "conducting custom tailored seminars for over seventy clients across a broad range of industries".

7. Defendant Gekoski, until July 16, 1981, was employed by The Mader Group in the respective positions of Director of Marketing, and Vice President in charge of marketing, operations, client services and new product development.

8. Mader Group is a closely held corporation, having been incorporated under the laws of the Commonwealth of Pennsylvania on October 26, 1978, with an authorized stock issue of 2,000 shares.

9. Christopher Mader was the owner of 1,000 shares pursuant to the execution of a subscription agreement dated October 30, 1978.

10. Defendant Aronson, during his employment with The Mader Group, was the owner of 100 shares of stock of The Mader Group.

11. Defendant Aronson was employed by The Mader Group as Director of Computer Resources and had the principal responsibility of developing computer programs and simulations while so employed.

12. In or about December, 1980, the aforementioned Christopher Mader died as a result of a fire which took place in a hotel where he was presenting a seminar of the type previously referred to.

13. Defendant Gekoski was employed by The Mader Group in March, 1980, in the position of Director of Marketing. In this capacity, he contacted client-customers and scheduled seminars. He was also responsible for the general operations of The Mader Group.

14. Defendant Gekoski had met Christopher Mader while defendant Gekoski was a student at the Wharton School of Finance, University of Pennsylvania.

15. Defendant Gekoski was hired for the salary of $39,000 per year plus participation in The Mader Group's salary weighted bonus plan. An additional consideration of his employment was an option to buy, at book value, one hundred shares of stock of The Mader Group.

16. Defendant Gekoski was also apprised of semi-annual salary reviews at midyear and year-end with raises based on performance and inflation.

17. Defendant Gekoski, in June, 1980, some three months after joining The Mader Group, contacted his former employer, Proctor-Silex, and made arrangements to return to their employment, because "my expectations with The Mader Group did not materialize".

18. The arrangement to return to Proctor-Silex was accomplished without any prior discussion with his then employer, Christopher Mader.

19. Upon advising Christopher Mader of his plan to return to Proctor-Silex, his position was changed to Vice President and Director, with responsibility for overall marketing and operations of Mader Group, all client services and new product development.

20. By his own description, defendant Gekoski outlined his position as being one wherein he contacted the clients; called on them; learned what their needs were; learned with whom to talk; discussed prices and costs; discussed seminar format and tentative dates; discussed specific requests for particular seminar lecturers; discussed places or sites for holding the seminars and cancellation provisions; and was engaged in customer development activities. Everyone employed at Mader Group reported to him but Christopher Mader.

21. As Vice President with the aforementioned responsibilities, defendant Gekoski, over the period of his employment with The Mader Group, gained particularized knowledge of the needs of the Group's clients and also gained knowledge with respect to the variables involved in setting both regular and special fees for the clients of the Group.

22. Defendant Gekoski had never met or contacted any person who made seminar commitments connected with any customer-clients of The Mader Group before his employment by Mader except one person who was connected with his former employer, Proctor-Silex.

23. There is no written evidence of documentation of any agreement between Dr. Mader and defendant Gekoski in June, 1980, wherein defendant Gekoski was promised a ten percent increase in sal-

ary as of January 1, 1981, an increase in his stock option from 100 shares to 125 shares, a further promise of an automobile and authorization to sign company checks.

24. Subsequent to Dr. Mader's death, both defendants continued in their respective positions previously described herein until their resignations on July 16, 1981.

25. Subsequent to Dr. Mader's death, Susan Mader, in her several capacities as Board Member, shareholder and as personal representative of her late huband's estate, made a decision to sell The Mader Group.

26. In or about February, 1981, a Boston based company, Data Resources, Inc., hereinafter referred to as DRI, had a representative sent to Mader Group to discuss the possibility of buying the Group.

27. Defendant Gekoski met with the representative of DRI but did not report this meeting to Mrs. Mader although he knew that she had offered the business for sale.

28. Mrs. Mader subsequently learned of the meeting between the DRI representative and Gekoski, but not from defendant Gekoski.

29. Defendant Gekoski and Aronson submitted a bid to purchase The Mader Group in late February or March, 1981, after discussing the subject of sale with Mrs. Mader.

30. In March, 1981, upon learning that her husband's death was believed to be the result of arson, Mrs. Mader went away with her children for approximately one week in order to attempt to regain her composure after learning the fatal fire was not accidental.

31. Upon her return, she learned that, in her absence, defendant Gekoski had increased his own salary from $41,000 to $50,000.

32. Defendant Gekoski had also increased the salary of defendant Aronson from approximately $26,000 to $32,500. Defendant Gekoski also increased the salaries of the other employees of The Mader Group. All the increases were retroactive to January 1, 1981.

33. Defendant made these increases without prior consultation with or agreement of Mrs. Mader who he knew to be absent, grief-stricken and in the process of attempting to either sell or wind up The Mader Group.

34. There had been a previous company policy to give employees cost of living increases at various times.

35. Both defendants' salary increases were in amounts of at least 20 percent more than they previously earned.

36. Defendant Gekoski admits that his salary increase which he effected amounted to 22 percent.

37. There was no evidence presented to support the conclusion that defendant Gekoski had the authority to increase his own salary, defendant Aronson's salary or any other employee's salary except in compliance with Section 5.14 of Article Five of the By-Laws of The Mader Group.

38. Defendant Gekoski admits that he knew that Mrs. Mader was opposed to any salary increases at the time when he did so.

39. Mrs. Mader contacted her attorney because she concluded that she was not being given full information and answers to questions that she asked defendants concerning the operation of the business and the details of contracts.

40. After her attorney met with defendants, there was still no better flow of information from defendants; and after the meeting with Mrs. Mader's at-

torney, the salary increases were made by defendant Gekoski.

41. Mrs. Mader was not in agreement with the raising of defendants' salaries.

42. Mrs. Mader discussed the possibility of sale of The Mader Group with Paul N. Wilson sometime in March, 1981. At the time of the initial discussion, she told Wilson that she had one bid from DRI and another bid from defendants.

43. At the time of the discussions with Wilson concerning the possible sale of Mader Group, and prior thereto, differences had developed between Mrs. Mader and defendants.

44. Mrs. Mader advised Mr. Wilson of the salary increases that had been effectuated and of the change in the financial situation of the company prior to accepting his bid.

45. In or about April, 1981, Mrs. Mader made the decision to sell the company to Paul Wilson, after DRI refused to buy the Group. Mrs. Mader advised defendants of her decision and the rejection of their bid soon thereafter.

46. Upon learning of Mrs. Mader's decision concerning the sale of Mader Group, defendant Gekoski told her that he thought she should take the bid made by Wilson.

47. Paul N. Wilson acquired Mader Group in mid-April, 1981.

48. After The Mader Group was acquired by Paul Wilson, defendant Gekoski continued in his same position, performing the same functions and giving lectures at seminars conducted for Parker-Hannifin; NRECA; American Express, Control Data Corporation; Smith, Kline and French; Rohm and Haas; and P.Q. Corporation.

49. Defendants Gekoski and Aronson incorporated defendant SMG while both were still in the employ of The Mader Group.

50. Neither Gekoski nor Aronson told Wilson of their intentions to form SMG and their subsequent accomplishment of these intentions.

51. Defendant Gekoski made the decision to leave The Mader Group employ sometime before June, 1981, most probably soon after the sale to Wilson in April, 1981.

52. Defenant Gekoski expressed his intention to leave Mader Group to some number of The Mader Group's customers before he told his employer of his intention to leave, such expression to clients possibly as early as April or May, 1981.

53. Defendant Gekoski told his employer Wilson of his intention to leave The Mader Group only when an incident in the office between defendant Gekoski and another employee became the subject of discussion between defendant and Wilson, such discussion taking place near the end of June or beginning of July, 1981.

54. When specifically asked what his future employment plans were, defendant Gekoski, having already, with defendant Aronson, formed a company to compete with his employer, intentionally misled his employer by telling him that he intended to interview for jobs. He did not tell him about SMG or his plan to compete.

55. Defendant Aronson, at or about the same time, advised Wilson of his intention to leave The Mader Group. When specifically asked as to his future employment activity, he intentionally misled his then employer by saying he intended to try getting a teaching job at the Wharton School.

56. On the aforementioned occasion, in answer to a direct question concerning whether he intend-

ed to compete against The Mader Group, defendant Aronson replied in the negative, never mentioning SMG.

57. Paul Wilson, as principal owner of The Mader Group, relied upon these representations made by defendants, and his reliance thereon resulted in the loss of certain clients and seminars which SMG gained and, at the time of the instant hearing, accomplished.

58. At the commencement of the instant hearing, defendant Aronson was not present because he was in Alabama representing SMG and conducting a seminar for NRECA, such seminar originally scheduled to be done by Mader Group.

59. Defendant Gekoski, after Mader Group acquisition by Wilson, had discussions with Wilson concerning his (Gekoski) introducing Wilson to key personnel in client companies. Gekoski was resistive to complying with this request.

60. Defendants Gekoski and Aronson both resigned as of July 16, 1981, as per their notices to Wilson.

61. Sometime in June, 1981, before notification of his intention to resign from The Mader Group, defendant Aronson asked Jean Goodwillie, another employee of Mader Group, to leave Mader Group to come to work for him.

62. Subsequent to Aronson's leaving Mader Group on July 16, 1981, Jean Goodwillie left The Mader Group and began working for SMG on August 17, 1981.

63. Defendant Gekoski admits that subsequent to the death of Christopher Mader that he was the person who discussed prices and fees with clients on behalf of The Mader Group.

64. Defendant Aronson as Director of Computer Resources was responsible for the preparation and

documentation of computer data that was made for certain clients of The Mader Group.

65. Defendant Aronson, while still employed by Mader Group, in a number of instances, did not send, or cause to be sent, documentation of software or programming to those clients which were entitled to such under the terms of their agreements with The Mader Group, e.g., see P-15.

66. Several clients who have severed their relationships with Mader Group have requested delivery of their documentations of programs and Mader Group has been, at this time, unable to fill their requests because materials upon which this documentation is based are missing or cannot be located.

67. Generally, these materials were subjected to the supervision and control of defendant Aronson while he was employed as Director of Computer Resources by The Mader Group.

68. As of the time of this hearing, 60 to 70 programs prepared for Mader Group clients have no documentation.

69. Outside consultants have been hired to "break the programs and unscramble them".

70. The court concludes that the incomplete or missing documentation has resulted either from defendant Aronson's failure to properly prepare such material or his failure to prepare it at all.

71. Clients have been requesting, from The Mader Group, documentation packages which were to be supplied under the provisions of their original agreements and which were never created.

72. Plaintiff Mader Group has received some of these requests for documentation from clients who have severed their relationships with Mader Group and have engaged defendants to provide the services which Mader Group formerly provided.

73. Plaintiff Mader Group has been handicapped and disadvantaged as a result of this condition which was primarily subject to the supervision and control of defendants in their respective positions of employment with The Mader Group.

74. On July 16, 1981, defendant Gekoski prepared and delivered on July 20, 1981, to Paul Wilson a memo which purported to advise Wilson as to the status of "all program information on files, slides, etc.". The memo showed all seminars which, as of that date, were scheduled, either firmly or tentatively, from July 16, 1981, thru December, 1981, and the clients for whom the seminars were to be done.

75. Since the date of delivery of that memo, some of the clients thereon have cancelled their seminars with The Mader Group and rescheduled them with defendants. Some of the seminars were conducted by defendants during the instant hearing.

76. Among the clients listed who cancelled their agreements with Mader Group were NRECA; HCA; SIR; ARA, American Express and Control Data Corporation, all of whom have made agreements with defendants to conduct the essentially same seminars.

77. Defendant Gekoski was elected to the Board of Directors of Mader Group at a special meeting in lieu of the annual meeting of shareholders of The Mader Group held on April 13, 1981.

78. Defendant Gekoski was elected to the office of Vice President of The Mader Group at a meeting of the Board of Directors held on April 13, 1981.

79. On April 17, 1981, Paul N. Wilson and defendant Michael Aronson, described as "constituting all the Shareholders of and entitled to vote of The Mader Group, Inc. . . . ," unanimously consented in writing to the following action of the Corporation: "RESOLVED, that the following persons be

and are hereby elected to serve as Directors of this Corporation for the ensuing year and until his respective successor is elected and qualified: Paul N. Wilson, Joyce E. Wilson, Normal H. Myers.

80. Defendant Gekoski admits having contacted the speakers and lecturers used by plaintiff for the purpose of using them as speakers for SMG. Some have consented to work for SMG and have financial interests therein.

81. No employees of Mader Group had written contracts of employment, nor were there any restrictions imposed with respect to working in the same activity after termination of employment with The Mader Group.

82. Over 90 percent of Mader Group's revenues are derived from the presentation of seminars.

83. The seminars listed on P-1 constituted 100 percent of the seminars scheduled by The Mader Group to the end of the year.

84. The seminars listed on P-1 represented approximately 90 percent of the Mader Group's earnings to the end of the year 1981.

85. The majority of the business done by The Mader Group is repeat business with the clients either having agreements for a series of seminars or ordering special events with variations according to the needs of the respective clients.

86. Of the 17 clients listed on Exhibit P-1 which described events scheduled firmly or tentatively for Mader Group, defendants contacted at least 12; and of this number, at least seven have cancelled their business relationships with The Mader Group and made agreements with SMG.

87. It is not the intention of SMG to use any materials such as computer documentation, notebooks or software which are the property of The Mader Group.

88. The Mader Group built a special computer simulation for INA which has been used by The Mader Group in various programs for INA.

89. Jean Goodwillie had the job of keeping the master pages of the instructional notebooks used by the Mader Group up to date. This was an important function which had to be done correctly.

90. Defendant Gekoski contacted NRECA on or about July 24th or July 25th concerning SMG doing a program for them. As of that date, NRECA had scheduled confirmed seminars to be handled by The Mader Group from September 9 through September 11, 1981. NRECA cancelled The Mader Group's seminars on August 4, 1981.

91. The simulation model used by Mader Group was relatively different than those used by other companies.

92. Defendants Gekoski and Aronson have contacted all the active customers of Mader Group except one or two that they knew of as of July 16, 1981, and asked them to do business with SMG.

93. Defendants intended to continue attempting to get business from those customers and any customers with scheduled seminars unless enjoined by the court.

94. Defendant Gekoski knew at the time he prepared and submitted the July 16 memo that he would be in a competing business when he left The Mader Group.

95. Defendant Gekoski contacted American Express on July 21, 1981, at which time a seminar had been tentatively scheduled to be performed by The Mader Group on September 14 through September 18, 1981. (American Express subsequently cancelled these and contracted with SMG to do them.)

96. Defendants knew that where clients had scheduled seminars with SMG they (the clients)

would cancel their seminars that had been scheduled with Mader Group.

97. Defendant Aronson submitted a bid on behalf of SMG to SIR on July 20 or July 21, 1981.

98. Defendants Gekoski and Aronson met with NRECA in the offices of NRECA on July 25, 1981.

99. The NRECA simulation which was prepared by The Mader Group was prepared specifically for NRECA use; it is a "business game" for rural electric supplying cooperatives which are "unique animals". This simulation or later revisions thereof have been used in all NRECA programs and at least 11 or 12 times in seminars conducted by The Mader Group.

100. The Society of Industrial Realtors industrial simulation was made for SIR by Mader Group in 1979 and has been used by Mader in a seminar in April, 1979, and there have been seven or eight sessions conducted by Mader using the program.

101. The Mader Group's hospital simulation was made with input from a team from Hospital Corporation of America. It was designed specifically for HCA business. It has been used by Mader for HCA at least four times and not used for any other client.

102. The "Not For Profit" simulation designed by The Mader Group was based upon a modification of its "For Profit" simulation. Tax aspects of the profit simulation were removed to get the "Not for Profit" model. This simulation has been used by Mader for Shared Medical Systems only.

103. Defendants Gekoski and Aronson anticipated purchasing The Mader Group and making their own venture.

104. Upon learning or having reason to believe that they would not be the successful bidders, they embarked on a course of conduct designed to undermine The Mader Group and build up their

opportunities to gain the clients of The Mader Group.

105. This course of conduct consisted of acts calculated to create an atmosphere in which Paul Wilson, as new owner, could not effectively maintain a continuity of service that would be reassuring to the clients of The Mader group.

106. Defendants knowingly failed to provide information and services during the last months of their employment which were essential to Mader Group's vitality and efficiency after their planned departure and entry into competition with The Mader Group.

## CONCLUSIONS OF LAW

1. Plaintiff Mader Group has no adequate remedy at law.

2. Plaintiff Mader Group has suffered and would continue to suffer immediate and irreparable harm unless the court granted the relief sought.

3. The granting of the preliminary injunction will prevent a greater injustice from taking place and essentially maintains the status quo until the issues can be resolved at trial.

4. Defendants Gekoski, Aronson and SMG, both before and after leaving the employ of plaintiff Mader Group, interfered and disrupted contractual relationships existing between The Mader Group and its clients.

5. Defendants engaged in a course of conduct that constituted unfair competition with plaintiff Mader Group.

6. Defendants breached the fiduciary responsibilities and obligations as former employees of plaintiff Mader Group by entering into competition using specialized knowledge gained in their positions.

## MEMORANDUM OPINION

KING, *J.*, September 24, 1981—Plaintiff Mader Group sought a preliminary injunction against defendants to restrain them from engaging in a competitive business activity of conducting executive educational seminars. Plaintiff's contentions for relief are threefold.

1. Defendants' conduct constitutes actionable interference with existing contractual relationships between plaintiff and its clients;

2. Defendants' conduct constitutes unfair competition under the case law of the Commonwealth of Pennsylvania; and

3. Defendants' conduct is a violation of the fiduciary duties owed by former corporate officers and employees to the corporation.

The court, after hearing six days of testimony and extensive arguments from both parties, granted a preliminary injunction, being satisfied that plaintiff had met its burden of proof.

A statement of facts, as briefly as possible, reveals that plaintiff is a corporation mainly engaged in the business of executive educational seminars. Plaintiff was founded by the late Dr. Christopher Mader, of the Wharton School of Finance, University of Pennsylvania.

Dr. Mader died tragically in a fire while conducting a seminar during December, 1980. Thereafter, his widow, Susan Mader, as personal representative of Dr. Mader's estate, offered the business for sale to several bidders. Among the bidders were Data Resources, Incorporated, a Boston based company, the individual defendants herein, and Paul N. Wilson, the ultimately successful bidder.

From about February, 1981, testimony reveals the affairs of The Mader Group underwent changes

that, in part, led to the parties' being before the court. Defendant Gekoski, in his capacity as Vice President in charge of Marketing, Sales and Operations, increased his own salary and the salaries of all the company employees, while knowing that Susan Mader, personal representaive of the estate of the deceased majority shareholder, was opposed to increased expenditures. After the acceptance of Wilson's bid and rejection of defendants' bid for the sale of the company, the individual defendants began to do things which weakened the structure of plaintiff company and paved the way for their own business opportunities. They formed a competing corporation while still in the employ of plaintiff; they discussed the fact of their intentions to leave with key people employed by plaintiff's clients; on at least one occasion, defendant Aronson successfully persuaded an employee of plaintiff to leave plaintiff's employ and join defendants' company; they sought commitments from lecturers who regularly were used by plaintiff in conducting seminars; they did not, when specifically asked, tell their new employer of their intentions to compete when he learned of their impending resignations. Defendant Gekoski, after preparation of a memo which purported to set forth all the scheduled seminars of plaintiff to the end of 1981, admits that he contacted most of the clients on the memo and successfully got them to cancel seminars with plaintiff and give their business to defendant SMG.

Defendant Aronson, as Director of Computer Resources, left plaintiff's employ without completing computer programmings which were due to customers under the provisions of agreements between plaintiff and the clients. After signing up clients who had existing contractual relationships with plaintiff, defendants knew that the clients would re-

quest computer programming which defendant Aronson had not prepared while still at the Mader Group.

Defendant Gekoski, as a result of his position, used his knowledge to contact clients and advise them of what his company could provide in terms of their special needs. Other acts are set out in the findings of fact attached hereto. Defendants admit that they have contacted all the clients of plaintiff and intend to do business with them unless enjoined.

The first issue is whether defendants' course of conduct, both before and after their employment with Mader Group terminated, constituted actionable interference with existing and prospective contractual relationships between plaintiff and its clients. Plaintiff cites Adler, Barish, Daniels Levin and Creskoff v. Epstein, et al., 482 Pa. 416, 393 A.2d 1175 (1978), in which the Supreme Court reinstated the lower court's decree enjoining former associates of Adler, Barish from interfering with the existing contractual relationships between Adler, Barish and its clients. The court's decision was bottomed upon its adoption of Section 766 of the Restatement of Torts in Birl v. Phila. Electric Co., 402 Pa. 297, 167 A.2d 472 (1961). In Adler, Barish, 393 A.2d at 1182, quoting from its Birl opinion, the court stated:

"The elements of this tort of inducing breach of contract or refusal to deal, which must be averred in the complaint, are set forth in the Restatement, Torts, §766, which says, '. . . one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) *perform a contract with another,* or (b) *enter* into or *continue a business relation* with another is liable to the other for the harm caused thereby'. In other words, the actor

must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result." (Emphasis supplied.)

The court in Adler, Barish also pointed out that the Restatement serves as the authority for the elements of a cause 'of action for intentional interference with existing as well as prospective contractual relation. 393 A.2d at 1182 N. 13.

This court is satisfied that the facts in the instant case reveal of a course of condcut on defendants' part which meet the elements set forth in §766 of the Restatement of Torts. While an examination of defendants' actions viewed singularly may not appear to be sinister, when viewed as a whole, there can hardly be any question but that the overall pattern of conduct was intentionally effectuated for the purpose of stripping plaintiff of the benefits flowing from existing contractual relationships with many of the named clients, and "prospective economic gains" that would probably result from plaintiff's previous satisfactory contacts with the named clients. Indeed, defendants admit that they systematically divided the list of plaintiff's clients and meticulously contacted them with a view to obtaining their business. In more than a few instances, they were eminently successful!! This court, therefore, is led to the firm conclusion that defendants acted for the purposes of causing the cancellation of contracts which plaintiff Mader Group held and defeating plaintiff's prospect for economic gain with their clients.

In assessing the issue as to whether the conduct of defendants was privileged, the Supreme Court's reference to its decision in Glenn v. Point Park College, 441 Pa. 474, 272 A.2d 895, 899 (1971), is instructive:

"The absence of privilege or justification in the tort under discussion is closely related to the element of intent. As stated by Harper & James, The Law of Torts, section 6.11, at 513-14: '. . . where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability.' What is or is not a privileged conduct in a given situation is not susceptible of precise definition."

According to Comment b. of section 767, Restatement (Second) of Torts, the "branch of tort law" concerning intentional interference with a contract or a prospective contractual relation of another "has not developed a crystallized set of definite rules as to the existence or nonexistence of a privilege to act in the manner stated in §§766, 766A or 766B. Because of this fact, this section is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another". Therefore, based on the Adler, Barish decision, 393 A.2d at 1184, this court is guided by the following factors in determining whether defendants' conduct was proper:

"(a) The nature of the actor's conduct,

(b) The actor's motive,

(c) The interests of the other with which the actor's conduct interferes,

(d) The interests sought to be advanced by the actor,

(e) The proximity or remoteness of the actor's conduct to the interference and

(f) The relations between the parties."

Further, as stated in Glenn, and quoted in Adler, Barish: "Harper & James refer in general to interference which 'are sanctioned by the "rules of the game" which society has adopted', and to 'the area of socially acceptable conduct which the law regards as privileged,' id at 510, 511, and treat the subject in detail in §§6.12 and 6.13." Based on the facts found by the court, and defendants' own admissions, defendants' conduct was improper, and meets the second element for the cause of action for intentional interference with contractual relations.

Finally, the third element of the cause of action for intentional interference with contractual relations is that the harm must actually result. As stated in the findings of fact, when certain contracts were cancelled and other customers were persuaded to deal with SMG rather than The Mader Group, plaintiff suffered precisely the type of loss which defendants' conduct was designed to precipitate.

The second issue presented to the court is whether defendants' conduct constitutes unfair competition under the common law of Pennsylvania. As a general principle, "an employer is entitled to protection against competitive use of information acquired by employees as a result of positions of trust". Robinson Electronic Supv. Co. v. Johnson, 397 Pa. 268, 271, 154 A.2d 494 (1959). Further, the court in Robinson, id. at 272, 154 A.2d at 496, applied the following principle as stated in Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957):

"In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices."

The court in Morgan's Home Equipment, 136 A.2d at 842, held that confidential customer data were "entitled to protection as a trade secret within the meaning of the Macbeth-Evans Rule", and the court in Robinson, 397 Pa. at 273, 154 A.2d at 497, held that defendant's "engaged in a course of conduct which was harmful, prejudicial and very unfair to the plaintiff and its business interests" and constituted "unfair competition".

It is significant to note here that the McBeth-Evans Rule applies to the use of trade secrets communicated to an employee during the course of a confidential relationship with his employer. According to McBeth-Evans, as quoted in the Robinson opinion, 397 Pa. at 271-272, 154 A.2d at 496:

"The character of the secrets, if they be peculiar and important to the business, is not material. They may be secrets or trade, or secrets of title, or secret processes of manufacture, or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged, nor even the same secrets as those sought to be protected, if they be discovered by the independent investigation of outside parties.

The duty of the servant not to disclose the secrets of the master may arise from an express contract or it may be implied from their confidential relations."

Defendants in the instant case claim that the customer files, materials and information, in addition to the computer software to which defendants had access, were not "trade secrets" notwithstanding the confidential relationship between Christopher Mader and defendant Gekoski. To support their claim, defendants cite Comment b. to the Restatement of Torts, §757. Defendants admit that customer lists may constitute trade secrets in Pennsylvania, based on the holding in Morgan's Home Equipment; however, a recognized exception to this rule is that customer lists can be easily or readily obtained through an independent source is unprotected. Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276, 283, 203 A.2d 469, 473 (1964), and Somat Corp. v. Combs, 40 D. & C. 2d 107 (1966).

Although the court in Somat refused to enjoin the use by defendants of plaintiff's customers' lists, and delineated the facts which militated against characterizing the information as "secret", 40 D. & C. 2d at 114, the facts in the instant case are distinguishable from those in Somat. Further, since the facts in the instant case are similar to those in Robinson, that case is dispositive of the issue raised here for the reasons discussed below.

In Robinson, 397 Pa. at 270, 154 A.2d at 495, defendants, "through their employment relationship with plaintiff, became familiar with the special problems and details of many potential customers' business establishments in the Philadelphia area. They were specifically hired for this purpose". Additionally, in Robinson, id., defendants "were in 'key' positions to gather technical data in regard to pro-

spective customers of plaintiff". Similarly, in the instant case, defendants Gekoski and Aronson were familiar with the "special problems and details" of both existing and potential customers of The Mader Group, and defendant Gekoski admitted in his testimony that he was hired specifically for this purpose. In his position as Director of Marketing, and subsequently as Vice President in charge of marketing, operations, client services and new product development, defendant Gekoski was provided with the opportunity to learn the needs and requirements of The Mader Group's customers, and the methods used by The Mader Group in setting fee scales for its clients. In light of the expenditure of The Mader Group in time and resources in order to develop the customer lists, this information could be duplicated only with considerable difficulty by others. Based on these facts, the court finds that the customer lists and information were sufficiently confidential and valuable to be protected.

The third issue is whether defendants' conduct constitutes a violation of the fiduciary duties owed to the corporation. In Boyd v. Cooper, 269 Pa. Super. 594, 597, 410 A.2d 860, 861 (1979), the court indicated that: ". . . under appropriate circumstances, a corporation may obtain injunctive or other appropriate relief against the abuse or misuse of confidential or inside information by a former officer or employee". Plaintiff advanced a theory that defendants diverted the corporate opportunity of the Mader Group in violation of their duty of undivided loyalty to the corporation. According to Judge Price's concurring opinion on Boyd, id. at 598, 410 A.2d at 862, "Such a theory of usurpation of a corporate opportunity is founded upon appellees' fiduciary duties flowing from their corporate positions, see Act of May 5, 1933, P.L. 364, art. IV, §408, as

amended, 15 P.S. §1408 (Supp. 1979-80); Lutherland, Inc. v. Dahlen, 357 Pa. 143, 53 A.2d 143 (1947), and a breach of these duties will support an action for injunctive relief." See also: Comment (e) to Section 393 of the Restatement (Second) of Agency.

In light of the facts developed at the hearing and on the pleadings, plaintiff raises a claim which constitutes the "appropriate circumstances" for which injunctive relief should be granted.

For all of the above reasons, the preliminary relief requested was granted.